THE RIGHT REVEREND, BISHOP CLIFTON W. DANIEL, 3RD, ROBERT J. POWELL, III, ALICE DILL LYNCH, TRUSTEES OF AND FOR THE DIOCESE OF EAST CAROLINA OF THE PROTESTANT EPISCOPAL CHURCH IN THE UNITED STATES OF AMERICA; CLIFTON W. DANIEL, 3RD, BISHOP OF THE DIOCESE OF EAST CAROLINA; AND NICHOLAS F. THEUNER, HARRIET GRUBER, AND DOROTHY RANEY, AS VESTRYMEN OF ST. ANDREW'S EPISCOPAL CHURCH OF MOREHEAD CITY, PLAINTIFFS V. RICHARD H. WRAY; MARK J. SUBER; JOSEPH A. LAWRENCE; JOSEPH M. McCLURE; HENRY LEN GIBBS; LORETTA GUTHRIE; PATRICIA M. DAVIS; ELOISE BLAIR; CHRIS WADE; VICKIE R. BISHOP; GEORGE D. PHILLIPS; JOHN H. KNELSON; C. KING COLE; JOHN GLADSTONE; JOHN GRAYSON; AND THAT ORGANIZATION CALLED BY ABOVE DEFENDANTS, INTERIM ANGLICAN EXPRESSION CHURCH IN MOREHEAD CITY, ALSO CALLED ST. ANDREW'S ANGLICAN CHURCH, ALSO CALLED ST. ANDREW'S EPISCOPAL CHURCH OF MOREHEAD CITY, EPISCOPAL PROVIDENCE (SIC) OF RWANDA, DEFENDANTS

No. COA02-768

(Filed 3 June 2003)

## 1. Pleadings— amendment—trustees substituted for organization

The trial court did not err by allowing the plaintiffs in a church dispute to amend their complaint to substitute the names of diocesan trustees for that of the diocese where defendant had not filed a responsive pleading prior to the amendment and the action was well within the statute of limitations period.

## 2. Parties— real party in interest not named—no prejudice

The trial court did not err by denying defendants' motion to dismiss an action over disputed church property because the national Episcopal organization (PECUSA) was not named as a party. Although PECUSA was a real party in interest because it could enforce the claim under its canons, defendants did not show prejudice from PECUSA's absence.

## 3. Churches and Religion— dissolving parish—property—connectional church—vesting in diocese

The trial court did not err by granting summary judgment for plaintiffs in a church property dispute because the church, St. Andrew's Episcopal Church of Morehead City, is a connectional church in property matters rather than an independent congregational church. The parent body of a connectional church has the right to control the property of local affiliated churches; in this case, the withdrawal of defendants from St. Andrew's essentially resulted in the dissolution of the parish, whereby the parish property vested in the Diocesan trustees until the Diocese recognized

the remaining members of the original congregation as the new St. Andrew's.

**4. Deeds— church canon creating deed of trust—unrecorded—enforceable between parties**

A canon of the Episcopal Church which essentially established a deed of trust but which was not recorded with the register of deeds was enforceable against defendants. The registration of deeds is primarily for the protection of purchasers for value and creditors; an unregistered deed is good between the parties.

**5. Adverse Possession— church property—hostile possession—evidence insufficient**

The trial court did not err by allowing summary judgment for plaintiffs in a dispute over church property where defendant contended that there was a material issue of fact as to adverse possession, but the record did not indicate that defendants' possession of any of the property was hostile prior to their decision to withdraw from the church organization on 28 February 2000.

**6. Statute of Frauds— church property—trust created by Canon—not signed**

The delivery and acceptance of a deed takes the covenants therein out of the statute of frauds, and a trust in church property was created by a Canon of the national Episcopal church even though it was not signed by defendants, who were attempting to withdraw St. Andrew's Episcopal Church from the national church.

**7. Churches and Religion— seceding church members—use of church name**

Defendants were properly enjoined from using the name "St. Andrew's Episcopal Church" or any confusingly similar name after they withdrew from the church. Seceding members should not be allowed to confuse the public or appropriate the name and good will of an existing parish by establishing another church in the same county with the same name.

**8. Churches and Religion— individual liability—withdrawal from church—church property**

The trial court erred by assessing liability against defendants individually in an action over disputed church property. Whether defendants were acting as trustees or directors of the original St.

DANIEL v. WRAY

[158 N.C. App. 161 (2003)]

Andrew's or of the church they formed after their withdrawal, defendants were nonetheless acting on behalf of a religious society and were immune under N.C.G.S. § 61-1(b).

Appeal by defendants from orders entered 6 July 2001 and 23 January 2002 by Judge John B. Lewis, Jr. and Judge John R. Jolly, Jr., respectively, in Carteret County Superior Court. Heard in the Court of Appeals 18 February 2003.

*Wheatly, Wheatly, Nobles, Weeks & Valentine, P.A., by C. R. Wheatly, Jr. and C. R. Wheatly, III; Charles B. Park, III; Miller, Hamilton, Snider & Odom, L.L.C., by Palmer C. Hamilton, for plaintiff-appellees.*

*Taylor & Taylor, by Nelson W. Taylor, III; Beswick, Marquardt and Goines, P.A., by M. Douglas Goines; Susan H. McIntyre, for defendant-appellants.*

HUNTER, Judge.

Defendants appeal an order denying their motion to dismiss plaintiffs' complaint for failure to allege registration of an assumed name certificate in their original complaint, as well as failure to join a real party in interest in this action. Further, defendants appeal an order granting plaintiffs' motion for summary judgment, which resulted in plaintiffs being declared the true "St. Andrew's Episcopal Church of Morehead City" and the rightful owners of all the parish's real and personal property. We affirm the trial court's decision with respect to both motions; however, we reverse the trial court's decision to assess liability against defendants in their individual capacities.

The Protestant Episcopal Church in the United States of America ("PECUSA") is a hierarchical or connectional church composed of 109 geographical dioceses. One such diocese, The Diocese of East Carolina ("Diocese"), admitted a missionary congregation called St. Andrew's Episcopal Church of Morehead City ("St. Andrew's") as a parish in 1952. As a parish within the Diocese's boundaries, St. Andrew's was bound by the Constitutions and Canons of that diocese, as well as the Constitutions and Canons of PECUSA.

Upon admission into the Diocese, St. Andrew's was deeded a parcel of land (containing three lots) in Morehead City by the Diocesan Trustees. The deed, which conveyed the land to the

"Vestrymen and Trustees for St. Andrew[']s Episcopal Church of Morehead City, . . . and their successors in office," contained the following language pursuant to PECUSA Canon II.6.1:

> The purpose of this conveyance is to transfer the above described property to the Vestrymen[] or Trustees of [] St. Andrew[']s . . . for the construction of a church or place of worship, and for the purpose of church use, and consent and approval for such construction by the Bishop of the Diocese and the Trustees is hereby freely given.

Over the next several years, St. Andrew's purchased and had conveyed to it by name, or to its then current vestry persons as vestry persons, nine other lots and parts of two others.

Following its establishment as a parish in the Diocese, St. Andrew's acted with full parish status and complied with the Canons of PECUSA and the Diocese. However, on 28 February 2000, the vestry of St. Andrew's unanimously resolved to withdraw from PECUSA and the Diocese. Its decision was announced at a subsequent parish meeting, and a majority of the parishioners supported the withdrawal.

Thereafter, the vestry sent a letter to the Right Reverend Bishop Clifton W. Daniel, 3rd ("Bishop Daniel"), Bishop of the Diocese, stating St. Andrew's was withdrawing from PECUSA and the Diocese to join the Interim Anglican Expression in the United States. The letter further stated that the name of the new parish would be "St. Andrew's Anglican Church of Morehead City"[1] and enclosed documents establishing parochial ownership of the St. Andrew's property and goods as deeded to the vestry. Bishop Daniel answered the letter, acknowledging the vestry members' resignations and withdrawal from the Episcopal Church, but advised them that "no vestry has the authority to withdraw a parish from membership . . . ." Bishop Daniel also laid claim to all property belonging to St. Andrew's because, pursuant to PECUSA Canon I.7.4, that property was to be held in trust for the parent body upon resignation and withdrawal of the vestry and other members.

On 11 May 2000, the Executive Council of the Diocese passed a resolution finding that twenty-five members of the St. Andrew's con-

---

1. At some point during the pendency of the subsequent action between the parties, defendants changed the name of their new church from St. Andrew's *Anglican* Church to St. Andrew's *Episcopal* Church.

gregation remained loyal to PECUSA and the Diocese. Those members had elected a new vestry and sought assistance in recovering the St. Andrew's property and goods from the departing vestry and members. The resolution further indicated that PECUSA Canon I.7.4 governed the property issues, and Bishop Daniel was to take such action as he deemed appropriate in returning the church property and goods to the newly organized vestry and congregation of St. Andrew's.

On 12 May 2000, Bishop Daniel, the newly elected vestry, and the Diocese (collectively "plaintiffs") filed suit against the former vestry of St. Andrew's and three other former clergymen of the parish (collectively "defendants"). Before an answer was filed, plaintiffs filed an amended complaint that substituted the names of the Diocesan Trustees for that of the Diocese. On 15 September 2000, defendants filed an answer which set forth motions that plaintiffs' action be dismissed pursuant to Section 1-69.1 of the North Carolina General Statutes ("Section 1-69.1") because the action was originally commenced naming the Diocese, an unincorporated association, as a plaintiff without alleging the registration of an assumed name certificate. Plaintiffs subsequently motioned to amend their amended complaint and, on 27 February 2001, plaintiffs were allowed to do so by adding allegations that stated an assumed name certificate had been filed for the Diocese with the Carteret County Register of Deeds. Defendants' motion to dismiss was denied in an order entered 6 July 2001.

The case was heard in July of 2001, but resulted in the trial court declaring a mistrial on 14 July 2001 when the jury failed to reach a verdict. The court further denied both parties' motions for judgment notwithstanding the verdict, as well as plaintiffs' motion for an injunction against defendants from using the name "St. Andrew's Episcopal Church."

As further proceedings on the action began, plaintiffs filed a motion for summary judgment on 17 December 2001.[2] The trial court granted the motion. Thus, plaintiffs were entitled to judgment in their favor as follows: (1) Plaintiffs were deemed to be the beneficial owners of all property formerly held by St. Andrew's; (2) defendants were permanently enjoined from using the name "St. Andrew's Episcopal Church" or any name confusingly similar; (3) defendants were required to make a written accounting for any funds received or

---

2. Plaintiffs had previously filed a motion for summary judgment on 2 October 2000 that was denied on 7 December 2000.

appropriated from the date of defendants' withdrawal from the Diocese; and (4) deeds recorded by defendants purporting to convey the church building to another parish were declared null and void. The cost of the action was taxed to defendants jointly and severally. Defendants appeal.

## I.

At the onset, we address defendants' two assigned errors arguing that plaintiffs' non-compliance with procedural requirements should have resulted in the dismissal of their action.

### A. Assumed Name Certificate

**[1]** First, defendants argue the trial court committed reversible error in denying their motion to dismiss because plaintiffs had failed to allege registration of the Diocese in an assumed name certificate. Section 1-69.1 requires an unincorporated association "bringing a suit in the name by which it is commonly known and called [to] allege the specific location of the recordation . . . ." N.C. Gen. Stat. § 1-69.1 (2001). Failure to do so is fatal to a complaint. *Cherokee Home Demonstration Club v. Oxendine*, 100 N.C. App. 622, 397 S.E.2d 643 (1990).

Here, plaintiffs' initial complaint violated Section 1-69.1 because it lacked the proper allegation when it named the Diocese as a party. Nevertheless, Rule 15(a) of the North Carolina Rules of Civil Procedure allows "[a] party [to] amend his pleading once as a matter of course at any time before a responsive pleading is served . . . ." N.C. Gen. Stat. § 1A-1, Rule 15(a) (2001). Defendants had filed no responsive pleading prior to plaintiffs filing their amended complaint that substituted the names of the Diocesan Trustees for that of the Diocese. Such an amendment is appropriate and does not bar a party's action unless there is a statute of limitations issue. *See Bob Killian Tire, Inc. v. Day Enters., Inc.*, 131 N.C. App. 330, 333, 506 S.E.2d 752, 754 (1998). Since plaintiffs' action was filed well within the limitations period, the trial court did not err in allowing the Diocese's name to be substituted so that it could act through its trustees. *See* N.C. Gen. Stat. § 61.1 (2001).

### B. Real Party in Interest

**[2]** Further, defendants argue the court erred in denying their motion to dismiss plaintiffs' action because PECUSA was not named as a party. Rule 17 of the North Carolina Rules of Civil Procedure pro-

vides, in part, that "[e]very claim shall be prosecuted in the name of the real party in interest[.]" N.C. Gen. Stat. § 1A-1, Rule 17(a) (2001). A real party in interest is " 'a party who is benefited or injured by the judgment in the case. An interest which warrants making a person a party is not an interest in the action involved merely, but some interest in the subject matter of the litigation.' " *Parnell v. Insurance Co.*, 263 N.C. 445, 448-49, 139 S.E.2d 723, 726 (1965) (citation omitted).

In the case *sub judice*, plaintiffs seek to enforce PECUSA Canon I.7.4, which essentially states that all real and personal property held by or for the benefit of St. Andrew's is held in trust for PECUSA and the Diocese. Defendants contend plaintiffs' action should have been dismissed because the canon specifically provides that the trust is for the benefit of the Diocese *and* PECUSA. We conclude that based upon the language of PECUSA Canon I.7.4, PECUSA was a real party in interest because it had a legal right to enforce the claim in question. Yet, Rule 17 provides that "[n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest[.]" N.C. Gen. Stat. § 1A-1, Rule 17(a). Thus, the trial court did not err in denying defendants' motion to dismiss; but, before ruling on plaintiffs' summary judgment motion, the court should have either granted a continuance to permit PECUSA's joinder or corrected the defect *ex mero motu. See Carolina First Nat'l Bank v. Douglas Gallery of Homes*, 68 N.C. App. 246, 251, 314 S.E.2d 801, 804 (1984).

Nevertheless, this Court has also held that "the absence of the real party in interest . . . does not constitute a 'fatal defect,' [if the defendants] failed to 'show real prejudice in not having had the real party joined at the original trial.' " *Id.* Defendants have not argued, nor have we found, any way in which they were prejudiced by not having PECUSA made a party to this action. Moreover, although defendants did raise this issue in their answer as an affirmative defense, they never pursued the defense in the trial court or raised it in opposition to plaintiffs' motion for summary judgment. Therefore, the denial of the motion was not prejudicial to defendants.

II.

[3] Defendants also argue the trial court erred in granting summary judgment in favor of plaintiffs because there were genuine issues of material fact regarding the ownership of the St. Andrew's property.

DANIEL v. WRAY

[158 N.C. App. 161 (2003)]

On an appeal from a grant of summary judgment, this Court reviews the trial court's decision *de novo. Falk Integrated Tech., Inc. v. Stack,* 132 N.C. App. 807, 809, 513 S.E.2d 572, 574 (1999). Thus, when viewing the evidence in the light most favorable to the non-movant, we must determine whether the trial court properly concluded that the moving party showed, through pleadings and affidavits, that there was no genuine issue of material fact and that the moving party was entitled to judgment as a matter of law. *Bruce-Terminix Co. v. Zurich Ins. Co.,* 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998).

Moreover, "[w]hile the civil courts have no jurisdiction over and no concern with purely ecclesiastical questions and controversies due to constitutional guarantees of freedom of religious profession and worship, the courts do have jurisdiction to determine property rights which are involved in, or arise from, a church controversy." *Looney v. Community Bible Holiness Church,* 103 N.C. App. 469, 473, 405 S.E.2d 811, 813 (1991). In determining these rights, "a central question is whether the church is connectional or congregational." *Fire Baptized Holiness Church v. McSwain,* 134 N.C. App. 676, 680, 518 S.E.2d 558, 560 (1999). "Connectional churches are governed by large bodies and individual congregations bear the same relation to the governing body as counties bear to the State. Congregational churches are independent republics, governed by the majority of its members and subject to control or supervision by no higher authority." *Looney,* 103 N.C. App. at 473, 405 S.E.2d at 813 (citations omitted).

In the instant case, it is undisputed that St. Andrew's is a connectional church. "As a general rule the parent body of a connectional church has the right to control the property of local affiliated churches, and, as a corollary, this right will be enforced in civil courts." *Id.* Plaintiffs contend the trial court properly granted summary judgment in their favor because, as a connectional church, the ownership of the St. Andrew's property is governed by the Constitutions and Canons of both PECUSA and the Diocese. Specifically, plaintiffs cite the following two canons to establish their rights to all the property:

[PECUSA Canon I.7.4]. All real or personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the

Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons.

. . . .

[Diocese Canon II.6.2]. In the event of the dissolution of any Parish or Mission by the Convention, the real and personal property of the Parish or Mission shall immediately vest in the Trustees of the Diocese, in trust for the dissolved Parish or Mission.

Defendants, however, contend that these canons do not apply because this Court clearly recognized in *Looney* and *Fire Baptized Holiness Church* that a church could be congregational as to property matters even though connectional in other ways.

In *Looney*, a local church joined with a denomination for purposes of fellowship. Following its joinder, the local church changed its name and wrote deeds to itself in that new name. Years later, the local church disassociated itself from the denomination, which subsequently appointed new trustees for the local church. The new trustees deeded the local church property to themselves, but members of the local church continued to occupy the property. The denomination, through the new trustees, brought suit against the local church seeking possession of the property. The trial court overruled the denomination's motions for directed verdict and for judgment notwithstanding the verdict and, following a jury verdict, declared the local church the sole owner of the property.

On appeal, the *Looney* Court considered, *inter alia*, whether the local church had manifested an implied assent to be governed by the denomination's General Assembly minutes which provided that the denomination controlled the local church property. The *Looney* Court concluded that, when viewed in the light most favorable to the local church, the evidence created "a jury question as to whether *as to church property* the local church intended to establish a connectional relationship with the denominational church." *Looney*, 103 N.C. App. at 474, 405 S.E.2d at 813-14. The trial court's judgment was upheld.

The *Looney* holding was heavily relied upon by this Court in the decision rendered in *Fire Baptized Holiness Church*. In that case, a local church also voted to withdraw from a denomination. The

denomination's trustees conveyed the local church property to themselves as trustees of a newly formed church. In an action brought by the denomination to determine ownership of the local church property, a jury found the denomination did not have rights to the property because the local church was not connectional.

On appeal, this Court determined there was evidence that signified the local church (1) had not recorded deeds as set out by the denomination's rules, and (2) had acquired additional property despite the denomination's clear disapproval. Evidence further indicated that the denomination had made no effort to enforce its rules at the time of those violations. Thus, as in *Looney*, this Court determined there was contradictory evidence regarding whether the local church manifested an implied assent to the denomination's rules governing ownership of the church property and whether the local church's failure to adhere to those rules signified its "desire for independence prior to its ultimate secession from the denomination[.]" *Fire Baptized Holiness Church*, 134 N.C. App. at 682, 518 S.E.2d at 561. The judgment in favor of the local church was affirmed.

Defendants argue that similar to *Looney* and *Fire Baptized Holiness Church*, this case should have been presented to a jury because a genuine issue of material fact exists as to whether defendants acted in a congregational manner with respect to property matters. Particularly, defendants contend that the evidence indicates they are the owners of the St. Andrew's real property because (1) as the former Vestry of St. Andrew's, they are the successors of the original parcel of land deeded to the parish by the Diocese, and (2) the additional real property owned by the parish was purchased without the assistance of PECUSA or the Diocese and prior to the adoption of PECUSA Canon I.7.4. Yet, despite the similarities between these three cases, there are also significant distinctions which require this Court to reach a different result.

In *Looney* and *Fire Baptized Holiness Church*, we held that there was a genuine issue of material fact as to whether the local church that withdrew from the denomination had impliedly assented to the rules of that denomination with respect to property matters. Conversely, the present case involves a controversy between competing factions of the St. Andrew's congregation, each faction claiming ownership of the same property. The evidence in the record establishes that prior to defendants' withdrawal, the entire St. Andrew's congregation had adhered to the Constitutions and Canons of PECUSA and the Diocese for nearly fifty years. During that time, St.

DANIEL v. WRAY

[158 N.C. App. 161 (2003)]

Andrew's elected delegates to participate in various conventions at which new and revised canons were adopted, and defendants did not contest the adoption of those canons thereafter. Under the language of these canons, it is clear that the St. Andrew's property was to be held in trust for the Diocese. Defendants' withdrawal from St. Andrew's essentially resulted in a dissolution of the parish whereby the property immediately vested in the Diocesan Trustees until the Executive Council of the Diocese passed a resolution recognizing those members of the original St. Andrew's congregation that remained loyal to PECUSA and the Diocese as the new St. Andrew's. Thus, the canons clearly established a form of governance impliedly assented to by defendants that precluded the seceding vestry from taking control of the St. Andrew's property.

## III.

Despite our conclusion that St. Andrew's is a connectional church as to property matters, defendants argue that material questions of fact still exist as to whether they have a defense that prevents the canons from encumbering the property. Specifically, defendants contend (A) PECUSA Canon I.7.4 does not create an interest in the property for plaintiffs because it was never recorded; (B) defendants were the owners of the St. Andrew's property by adverse possession; (C) PECUSA Canon I.7.4. violated the Statute of Frauds because it was not signed; and (D) the doctrine of estoppel or laches bars plaintiffs' action because neither PECUSA nor the Diocese attempted to enforce PECUSA Canon II.6.2[3] when St. Andrew's conveyed away and encumbered its property without obtaining the prior consent of the Bishop.

## A. Recordation

[4] With respect to the St. Andrew's real property, PECUSA Canon I.7.4 essentially established a deed of trust. Defendants contend that since this canon was never recorded with the Register of Deeds, it cannot effectively create an interest for plaintiffs in the property. However, North Carolina recognizes that "[t]he registration of deeds

---

3. PECUSA Canon II.6.2 states:

It shall not be lawful for any Vestry, Trustees, or other body authorized by laws of any State or Territory to hold property for any Diocese, Parish or Congregation, to encumber or alienate any dedicated and consecrated Church or Chapel, or any Church or Chapel which has been used solely for Divine Service, belonging to the Parish or Congregation which they represent, without the previous consent of the Bishop, acting with the advice and consent of the Standing Committee of the Diocese.

is primarily for the protection of purchasers for value and creditors; an unregistered deed is good as between the parties and the fact that it is not registered does not affect the equities between the parties." *Bowden v. Bowden*, 264 N.C. 296, 302, 141 S.E.2d 621, 627 (1965). *See also Patterson v. Bryant*, 216 N.C. 550, 5 S.E.2d 849 (1939). Defendants, in their positions as former vestry and clergy of St. Andrew's, had knowledge of PECUSA Canon I.7.4. Thus, while it is likely this unrecorded canon would have been unenforceable against innocent purchasers for value or creditors, it is enforceable against defendants.

## B. Adverse Possession

**[5]** Defendants argue the trial court committed reversible error by allowing plaintiffs' motion for summary judgment when there were material questions of fact as to whether defendants had adversely possessed the St. Andrew's real property. Defendants, however, did not forecast evidence that their possession of that property was hostile, an essential element of adverse possession. "A 'hostile' use is simply a use of such nature and exercised under such circumstances as to manifest and give notice that the use is being made under claim of right." *Dulin v. Faires*, 266 N.C. 257, 261, 145 S.E.2d 873, 875 (1966). The record does not indicate that defendants' possession of any of the property was hostile prior to their decision to withdraw from PECUSA and the Diocese on 28 February 2000. Plaintiffs filed this action on 12 May 2000. Therefore, absent such hostility for the required period of time, we cannot conclude that the trial court erred in granting summary judgment in favor of plaintiffs on this issue.

## C. Statute of Frauds

**[6]** Defendants further argue PECUSA Canon I.7.4 violated the Statute of Frauds and thus, does not govern the ownership of the St. Andrew's property because they never signed it. This Court recognizes that "[a] grantee, by acceptance of a deed, becomes bound by conditions, etc., contained therein, even though he has not signed the deed. The delivery and acceptance of a deed takes covenants contained therein out of the operation of the statute of frauds." *Harris & Gurganus v. Williams*, 37 N.C. App. 585, 587, 246 S.E.2d 791, 794 (1978) (citations omitted). As previously stated, St. Andrew's is a connectional church that agreed to be bound by the Constitutions and Canons of PECUSA and the Diocese. In doing so, defendants, as the former vestry and clergy of St. Andrew's, "accepted" PECUSA Canon

I.7.4 as establishing a deed of trust in which the St. Andrew's property would be held upon their resignation and withdrawal. Therefore, this canon did create a valid trust even though it was not signed by defendants.

## D. Estoppel and Laches

Additionally, defendants argue plaintiffs' action is barred by either the doctrine of estoppel or laches. However, after considering our analysis of the previous arguments raised by defendants in this case, we conclude this argument to be without merit and warrants no further decision.

## IV.

[7] Next, defendants argue there was a genuine issue of material fact as to whether the name, "St. Andrew's Episcopal Church," had acquired a secondary meaning exclusive to plaintiffs thereby resulting in the trial court enjoining defendants from further use of that name. Defendants contend the words "St. Andrew's" and "Episcopal" are so common and generic that their use of these words as the name of their new church will not result in confusion of the public. We disagree.

In addressing plaintiffs' argument, we are persuaded by *Purcell v. Summers*, 145 F.2d 979 (4th Cir. 1944). In *Purcell*, three branches of the Methodist Church joined to become "The Methodist Church for the United Church." However, an opposing group seceded and began using the name of one of the former branches, "The Methodist Episcopal Church, South." The Methodist Church brought litigation to enjoin the use of the former branch name, which the trial court denied. On appeal, the United States Court of Appeals for the Fourth Circuit concluded:

> The right to use the name inheres in the institution, not in its members; and, when they cease to be members of the institution, use by them of the name is misleading and, if injurious to the institution, should be enjoined. No question of religious liberty is involved. Men have the right to worship God according to the dictates of conscience; but they have no right in doing so to make use of a name which will enable them to appropriate the good will which has been built up by an organization with which they are no longer connected. . . .
>
> . . . .

It is said that the words "Methodist" and "Episcopal" are generic terms and that defendants have the right to use them for that reason, but defendants are not proposing to use either of these words in a new name so different from the old that no confusion could result. . . . [T]he question is, not whether they have the right to use "Methodist" or "Episcopal" in a new name so constructed as to avoid confusion, but whether they have the right to use the old name in a way that amounts, as we think it does, to implied misrepresentation to the damage of plaintiffs.

*Id.* at 987-88. *See also Christian Science Bd. of Directors v. Robinson*, 115 F. Supp. 2d 607 (W.D.N.C. 2000).

The issue addressed by the Fourth Circuit appellate court in *Purcell* is virtually identical to the issue currently before us. Here, plaintiffs sought to enjoin defendants from using the same name that was adopted by PECUSA and the Diocese for a parish that has been located in Carteret County for approximately fifty years. Defendants, as the seceding members of St. Andrew's, should not be allowed to confuse the public or appropriate the standing and good will of this still existing parish by establishing another church in Carteret County with the same name. Therefore, based on the rationale applied in *Purcell*, we conclude summary judgment was properly granted in favor of plaintiffs enjoining defendants from using the name "St. Andrew's Episcopal Church" or any name confusingly similar.

V.

[8] Finally, defendants argue the trial court erred in placing liability on them individually because they were acting as directors and officers of a religious society. We agree.

Section 61-1(b) of our statutes states that "[a] person serving as a trustee . . . or a director or officer of a religious society shall be immune individually from civil liability for monetary damages, except to the extent covered by insurance, for any act or failure to act arising out of this service[.]" N.C. Gen. Stat. § 61-1(b). *See also Pressly v. Walker*, 238 N.C. 732, 78 S.E.2d 920 (1953). Plaintiffs contend defendants are not immune from individual liability because they were not acting within their official duties as vestry members or clergymen of St. Andrew's when they appropriated the church's real and personal property after seceding from the Diocese and PECUSA. Whether defendants were acting as trustees or directors of the original St. Andrew's or of the church they formed after withdrawal from the Diocese and PECUSA, defendants were nonetheless still acting on

behalf of a religious society. Thus, the trial court erred in finding defendants individually liable.

In conclusion, the trial court did not err in denying defendants' motion to dismiss plaintiffs' action for failure to allege the Diocese in an assumed name certificate. Nor did the court commit prejudicial error by not joining PECUSA as a real party in interest. Moreover, the court did not err in granting plaintiffs' summary judgment motion with respect to ownership of the St. Andrew's property and enjoining defendants from using the name "St. Andrew's Episcopal Church" or any name confusingly similar. However, the trial court did err in assessing liability against defendants in their individual capacities.

Affirmed in part, reversed in part.

Judges BRYANT and ELMORE concur.