462 Pa. 348 (1975)
341 A.2d 114
ARCHBISHOP MOST REVEREND METROPOLITAN AMBROSE SENYSHYN, Appellee,
v.
Andrew KARLAK, et al., Appellants.
Supreme Court of Pennsylvania.
Argued April 15, 1974.
Decided June 7, 1975.
*349 Paul Matzko Erskine, Wolfson, Matzko & Pierson, Philadelphia, for appellants.
Joseph N. Bongiovanni, Jr., James E. Riely, Speese, Kephart & Bongiovanni, Philadelphia, for appellee.
Before JONES, C.J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*350 OPINION OF THE COURT
EAGEN, Justice.
This is an appeal from a final decree in equity holding that Sts. Peter and Paul Greek Catholic Church of Mount Carmel, Pennsylvania, a corporation, is and has been since its founding a uniate Greek Catholic Church in union with Rome. The appellants are former officers of the church corporation. The appellee is Ambrose Senyshyn, Archbishop of The Philadelphia Metropolitan of the Ukrainian Catholics of the Byzantine Rite of the United States, who instituted this action to enjoin the appellants from interfering with "the operation" of the church and to secure from the appellants an accounting of certain church assets alleged to be in their possession.
The dispute arose when two separate factions of the congregation elected different sets of officers and directors of the church corporation. On November 15, 1969, an annual meeting was called by the appellants, the then officers and directors, for the purpose of electing new officers and a Board of Directors. This meeting was, however, adjourned without any balloting. When appellants, after repeated requests, failed to reconvene a meeting for the aforementioned purpose, the pastor of the church, Father Paul Burak, called a meeting of the congregation. This meeting was conducted May 31, 1970, and resulted in the election of certain officers and directors. On June 18, 1970, the appellants convened another meeting at which they were re-elected to the offices they had previously held. Thus, there were two competing groups laying claim to the same offices. The appellants remained in control of the church property and assets.
In an effort to resolve the controversy, the appellee, in his official capacity as head of the Philadelphia Archparchy, convened a Board of Inquiry. After two meetings at the church, the Board of Inquiry issued a written report *351 containing its findings and recommendations. Pursuant to the report, the appellee on December 13, 1970, issued an official written order: (1) appointing a committee of advisory councilors to the church, effective immediately; (2) directing that all property of the church be delivered to the custody of the pastor; and (3) authorizing church collections to be taken only by ushers duly designated by the pastor. After appellants failed to comply with appellee's order, the appellee brought this action.
The crucial issue on this appeal is whether Sts. Peter and Paul is a uniate church under Archbishop Senyshyn's jurisdiction.[1]
Our inquiry must begin with a determination of the ecclesiastical nature of Sts. Peter and Paul on the date of founding, inasmuch as Pennsylvania law prohibits a diversion of church property from a use to which it was initially dedicated to an inconsistent use. See the Lay Control of Church Property Act, Act of April 26, 1855, P.L. 328, as amended, 10 P.S. § 81. See also St. John Chrysostom Creek Catholic Church of Pittsburgh v. Elko, 436 Pa. 243, 259 A.2d 419 (1969), cert. denied 399 U.S. 920, 90 S.Ct. 2258, 26 L.Ed.2d 786 (1970); Gabster v. Mesaros, 422 Pa. 116, 220 A.2d 639 (1966); Schnorr's Appeal, 67 Pa. 138 (1870). Accordingly, if Sts. Peter and Paul were at its inception uniate, it remains so today. On the other hand, if it were founded as an independent church, it is and remains autonomous.
On April 9, 1973, following an extended hearing, the chancellor entered a decree nisi[2] pursuant to Pa.R.Civ.P. *352 1517 based upon his conclusion that Sts. Peter and Paul had been founded as a uniate church in union with Rome and was subject to the ecclesiastical jurisdiction of the Pope of Rome. Exceptions to this adjudication and decree were dismissed by the court en banc,[3] and the chancellor's decree was made final.
The appellant's main argument is that the chancellor erred in going beyond the 1893 charter of the church corporation to resolve the instant dispute. The chancellor, relying in part upon our decision in St. John Chrysostom Greek Catholic Church of Pittsburgh v. Elko, supra, ruled that the charter was inconclusive as to the ecclesiastical nature of Sts. Peter and Paul and in his search for the ultimate authority in the church admitted evidence of subsequent rituals and practices.
Specifically, the appellants urge the following four aspects of the charter conclusively determine the intent of the church founders to establish an independent church free of hierarchical authority: (1) the name given the church; (2) the purpose expressed; (3) a consideration of what the charter omits to state; and (4) the provision vesting control of church property in the majority of lay members of the congregation.
The charter recites the name of the church as "The Greek Catholic Church of Mount Carmel". This Court has previously noted that the term "Greek Catholic" can refer to: (1) an independent church; (2) an orthodox church under a patriarch; or (3) a uniate church (i.e. *353 in union with Rome). St. John Chrysostom Greek Catholic Church of Pittsburgh v. Elko, supra, 436 Pa. at 250, n. 4, 259 A.2d at 422, n. 4. Hence, the ambiguity of this term prevents the drawing of a definitive conclusion as to the type of church the founders intended to create.
The purpose of the charter suffers from the same ambiguity. The charter recites the purpose of the proposed corporation to be "the support of the public worship of Almighty God according to the faith and the doctrines of the Greek Catholic Church in the United States. . . ." Again, since the term "Greek Catholic" is not clear and free of ambiguity, a definitive conclusion cannot be deduced from the purpose clause.
The appellants urge that the omission of any words such as "uniate" or "united" demonstrates a lack of intention on the founders' part to affiliate with any hierarchical organization. If the founders' intent were so to affiliate, appellants argue, there would have been no simpler way to express that intent than by the inclusion of such words. This argument, however, is a two-edged sword. It can just as readily be inferred that the absence of the term "independent" or "autonomous" or words of like import indicates a lack of intention on the founders' part to be independent of any hierarchical affiliation.
Finally, the appellants assert the inclusion of the following language in the charter militates against a finding of any intent to be a constituent part of a hierarchy:
"Any property, real or personal, which shall hereafter be bequeathed, devised, or conveyed to said corporation, shall be taken and held, or enure to it, subject to the control and disposition of the lay members or such constituted officers or representatives thereof, as shall be composed of a majority of lay members, citizens of Pennsylvania, having a controlling power according to the rules, regulations, usages or corporate requirements thereof."
*354 This language is merely a reiteration of the relevant portions of the Lay Control of Church Property Act, Act of April 26, 1855, P.L. 328, § 7, 10 P.S. § 81, in force at the time Sts. Peter and Paul was incorporated. Since, at that time, power of control over church properties was by force of this statute lodged in the lay members of the church or their authorized representatives, the incorporation of the language of this statute into the corporate charter merely described the situation that would have obtained in the absence of such language. We fail to discern how the manner in which the church properties were to be held was, under the circumstances, definitive of the ecclesiastical nature of the church.[4]
We conclude, therefore, that the chancellor was fully justified in going beyond the church's charter to an examination of subsequent rituals and practices to determine what kind of church Sts. Peter and Paul is.
In looking to evidence of the church's subsequent rituals and practices during its entire existence, the chancellor made extensive findings of fact which can be summarized as follows:
In the 1870's emigrants from that part of the Austro-Hungarian Empire, known as Galicia, came to America and settled in the area of Mount Carmel and the neighboring communities of Shamokin and Shenandoah. In 1884, a group of people from Shenandoah wrote to the then Archbishop Sembratovich in Galicia, who was the *355 Archbishop of all Greek Catholics united under the Pope in Central Europe, and requested that a priest be sent to Shenandoah so that the emigrants could practice their faith according to the custom of their homeland. Archbishop Sembratovich sent a Father Ivan Volansky to the Shenandoah area in December 1884. Father Volansky had the jurisdictional faculties granted to him by Archbishop Sembratovich, and also jurisdiction from the Pope to act as a missionary in the United States. Following his arrival Father Volansky established parishes in Shenandoah, Shamokin, and also Mount Carmel. On February 10, 1893, a corporate charter, issued in the name of "The Greek Catholic Church of Mount Carmel", was granted by the Court of Common Pleas of Northumberland County. The church later became known as Sts. Peter and Paul Greek Catholic Church to signify the Saints' names assigned to it.
The official Roman Catholic Directories for the United States, for the years 1894 and 1895 list, Sts. Peter and Paul Greek Catholic Church of Mount Carmel as part of the Diocese of Harrisburg, and as a mission parish served by a priest from the Shamokin parish.
Official Roman Catholic Directories for different years between 1896 and 1900 list the pastor and rector of Sts. Peter and Paul Greek Catholic Church, Mount Carmel.
In 1907 Bishop Soter Ortynsky was named to the newly created office of Bishop for the Ruthenian Greek Catholics in the United States (successor to the Greek Catholic Church in the United States), a jurisdictional entity created to administer the parishes in the United States who follow the Eastern Rite. Bishop Ortynsky and his successor (in 1924 the Ruthenian Greek Catholic Church in the United States became the Ukrainian Catholic Church in the United States) have made continuous appointments of priests to Sts. Peter and Paul. All the priests appointed have been uniformly uniate under the *356 jurisdiction of Rome, and their services have been conducted according to the rites, usages and customs of the uniate church under the Pope of Rome.
While Sts. Peter and Paul Church has been in existence there is a record of: (1) continuous communication between the priests assigned to Sts. Peter and Paul and diocesan officials, concerning matters of church government and administration including matrimonial dispensations, reports by priests, faculties permitting reception of converts, and consecration of church property; (2) audiences with or visits by different Bishops of the Diocese and other members of the Roman Catholic hierarchy for a variety of purposes including church administration, canonical visitation and dedications of church property; and (3) constant communication between the members of the congregation or lay officials of the church and officials of the Diocese regarding church matters; (4) liberal support of the Diocese on account of various church causes including cathedraticum for support of the Bishop, payments for the expenses of the Diocese and contributions to new cathedrals.
The record discloses that the appellants themselves in the 1960's sought to effect a transfer of the then pastor and assignment of a new priest in his stead through established hierarchical channels rather than through self-action as would occur in an independent parish. Compare St. John Chrysostom Greek Catholic Church of Pittsburgh v. Elko, supra, with Saint John The Baptist Greek Catholic Church of Allentown v. Musko, 448 Pa. 136, 292 A.2d 319 (1972).
Based upon these findings, the chancellor reached the conclusion that Sts. Peter and Paul is a uniate church under Rome. It is fundamental that the chancellor's fact findings approved by a court en banc have the effect of a jury verdict, and absent an error of law, will not be disturbed on appeal if supported by competent *357 evidence. See Hatalowich v. Redevelopment Authority of Monessen, 454 Pa. 481, 312 A.2d 22 (1973).
Our review of the record indicates the chancellor's findings are supported by competent evidence, and the chancellor's conclusion that Sts. Peter and Paul is a uniate church was legally warranted.
Again, we take pains to point out that our decision here, as in St. John Chrysostom Greek Catholic Church of Pittsburgh v. Elko, supra, does no violence to the United States Supreme Court decision in Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). We have not entered into any constitutionally prohibited interpretation of church doctrine to resolve the instant dispute, but have considered purely factual matters in order to ascertain the ecclesiastical nature of Sts. Peter and Paul.
Decree affirmed. Each side to pay own costs.
ROBERTS, J., filed a dissenting opinion.
MANDERINO, J., filed a dissenting opinion.
MANDERINO, Justice (dissenting).
The majority arrives at its decision by a consideration of whether a church corporation  a legal entity in Pennsylvania  is a "uniate church" and by ascertaining the "ecclesiastical nature" of the church corporation. Such an approach is unlike any used when we have before us the problems of any other legal person  including profit and nonprofit corporations. When we consider a dispute involving the control of a business corporation, we do not consider whether that corporation is a "uniate" with its parent corporation. We do not consider any kind of "nature"  eccesiastical or otherwise  about the business corporation. When we have before us a dispute involving a nonprofit corporation  for example, a charity  we *358 do not consider whether that corporation is in "uniate" with some national or international organization interested in a particular charitable purpose. We do not consider the benevolent "nature" of the nonprofit corporation.
This appeal involves a dispute about who controls a corporation  a legal entity under the law of Pennsylvania. There is absolutely no need to consider the dispute in mysterious nomenclature, which has its proper purpose in other sciences, but not the law. Our law recognizes individual persons and corporate persons, and we have laws and regulations which tell us how to determine who properly has control of a corporation at any given moment. My review of this record indicates that the appellants are the duly elected officers and directors of the corporation. Until they are legally removed, a court should not interfere.
The majority opinion speaks of "uniate," "ecclesiastical nature," "hierarchical," "rituals and practices," "allegiance," "religious authority": language proper to the world of theology and religion  a world in which the constitution says we do not belong. Unless we analyze legal problems involving church groups like we analyze problems involving other kinds of groups, we will continue to be lost in a maze of mysterious language such as this.
What does "in uniate" mean? What does "ecclesiastical nature" mean? I cannot agree that the findings of fact of the lower court sustain the decision because in all candor I haven't the slightest idea  as a Justice of this Court  what the concepts of "ecclesiastical nature" and "uniate" mean.
The majority opinion begins by stating that this is an appeal from a final decree holding "that Sts. Peter and Paul Greek Catholic Church of Mount Carmel, Pennsylvania, a corporation, is and has been since its founding a uniate Greek Catholic Church in union with Rome." The *359 opinion ends by saying that "we have not entered into any constitutionally prohibited interpretation of church doctrine to resolve the instant dispute . . . ." The beginning and the ending of the opinion are in strict contradiction. If the lower court decree made a determination that the church corporation in this case is "a uniate Greek Catholic Church in union with Rome," the instant dispute has definitely been resolved by entering into the prohibited area of interpreting church doctrine.
ROBERTS, Justice (dissenting).
The majority today continues the practice of impermissibly deciding disputes over control of church property on ecclesiastical grounds. See Saint John the Baptist Greek Catholic Church v. Musko, 448 Pa. 136, 143, 292 A.2d 319, 322 (1972) (concurring opinion of Roberts, J., joined by Nix & Manderino, JJ.); St. John Chrysostom Greek Catholic Church v. Elko, 436 Pa. 243, 256, 259 A. 2d 419, 425 (1969) (dissenting opinion). Under what I view as the proper rule of law, appellee has failed to show any basis for relief and the decree in his favor must be reversed. I therefore dissent.
Appellants claim to be the duly elected officers of the Saints Peter and Paul Greek Catholic Church of Mount Carmel (Church), a Pennsylvania corporation. Appellee, Archbishop Senyshyn, is the head of the Archparchy of Philadelphia and claims ecclesiastical jurisdiction over the Church. When a dispute arose as to whether appellants or others were the duly elected officers of the Church, appellee sought to exercise his claimed jurisdiction by appointing a board of inquiry to determine the question. Appellants denied that appellee had any authority over the Church and refused to participate in the inquiry. The board concluded that the other contenders were the duly elected officers of the Church, but recommended that appellee supersede the corporate structure and vest control of the property of the Church in its pastor, *360 appointing those found to be the duly elected officers of the Church as advisory councilors. Appellee issued an order to that effect, but appellants refused to comply with it. Appellee then commenced this action seeking to enjoin appellants from "interfering" with the operation of the Church and to compel them to account for assets of the Church in their possession. The trial court granted this relief.
The majority affirms this decree on the basis of its conclusion as to "the ecclesiastical nature" of the Church. In my view, such an inquiry is forbidden by the First Amendment, which leaves "the civil courts no role in determining ecclesiastical questions in the process of resolving property disputes." Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 447, 89 S.Ct. 605 (1969) [hereinafter Presbyterian Church].
In Presbyterian Church, the United States Supreme Court unanimously held that the First Amendment
"commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions."
393 U.S. at 449, 89 S.Ct. at 606.
As I observed in my dissent in Saint John Chrysostom Greek Catholic Church, supra, the doctrine applied by the majority inevitably requires this forbidden type of inquiry. In order to avoid any determination of ecclesiastical questions, I adhere to the position expressed in that dissent:
"I would adopt instead the `formal title' approach to church property controversies. Under that approach, `the title holder of the property has the right to determine the use of the property with neither theology *361 nor administrative church law as relevant considerations. Churches need not be classified as either hierarchical or congregational as in the Watson v. Jones [13 Wall. 679, 20 L.Ed. 666] approach. The civil courts under this alternative would enforce deeds, reverter clauses, and general state corporation laws in the same manner as in resolving any property dispute.' Comment, 55 Iowa L.Rev. 899, 907, n. 5 (1969). Cf. Presbyterian Church, 393 U.S. at 452, 89 S.Ct. at 607, 21 L.Ed.2d 658 (HARLAN, J., concurring).
"This theory has the advantage of almost never involving a court with the vexing problem of whether proffered evidence is admissible under the First Amendment. Further, adjudicating church property disputes by relying on formal title will ensure a more even-handed administration of justice, since the necessary evidence will almost always be admissible. Unlike the majority's approach, the formal title approach will never involve civil courts in deciding what the polity of a given church is, a determination which will almost inevitably involve ecclesiastical considerations.
"One final advantage inherent in this approach is that it invites and encourages religious organizations to title their property as clearly and unambiguously as possible. Such a result was obviously within the contemplation of Presbyterian Church wherein the United States Supreme Court admonished that `[s]tates, religious organizations and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.' 393 U.S. at 449, 89 S.Ct. at 606."
436 Pa. at 260-61, 259 A.2d at 427-28.
Under this approach, the resolution of this case presents no difficulties. Appellee makes no claim to the formal title to the property of the Church; that title is conceded by all to be in the Church itself. The other claimants to the offices which appellants claim to hold *362 are not parties to this action, so there is no occasion to determine that dispute. Consequently, it is clear that appellee is entitled to no relief in this action.
The majority contends that its action is dictated by the Act of June 20, 1935, P.L. 353, § 1, 10 P.S. § 81 (1963), which provides in pertinent part:
"Whensoever any property, real or personal, has heretofore been or shall hereafter be bequeathed, devised, or conveyed to any ecclesiastical corporation. . . for the use of any church . . . the same shall be taken and held subject to the control and disposition of such officers or authorities of such church . . . having a controlling power according to the rules, regulations, usages, or corporate requirements of such church . . . which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body, denomination or organization to which such church. . . shall belong . . . ."
To the extent that this statute requires the courts of the Commonwealth to engage in inquiries forbidden by the First Amendment, it is simply invalid. However, the statute is entirely susceptible to a construction mandating the determination of such questions in the same manner as if the corporation involved not a church corporation. That is, the "rules, regulations, usages, or corporate requirements" referred to by the statute can be understood to mean the corporation's charter, bylaws, and customary rules of procedure. The "denomination. . . to which such church . . . shall belong," if any, can then be determined from these authorities and its "rules and regulations, usages, canons, discipline and requirements" ascertained in a similar manner. While the majority's construction of the statute might also be a permissible one in the absence of constitutional *363 constraint, we are bound to construe statutes in a manner which will preserve their validity. Statutory Construction Act, 1 Pa.C.S. § 1922(3) (Supp. 1974); Bentman v. Seventh Ward Democratic Executive Committee, 421 Pa. 188, 218 A.2d 261 (1966). Consequently, I conclude that the statute should be construed in the manner indicated. As so construed, it supports the position of appellants in this case and dictates reversal.
NOTES
[1] The appellants assert that the only real issue involved here is which group of officers and directors are the duly elected officeholders. The resolution of this issue necessarily depends upon resolution of the larger questions as to the ecclesiastical nature of Sts. Peter and Paul.
[2] Initially, a decree nisi was entered April 14, 1971. The appellants excepted but the court en banc dismissed all exceptions on the ground that the decree was a consent decree. On appeal to this Court, we held that an attorney has no authority to enter a consent decree for his client without the client's direction, knowledge and consent, and, hence, the consent decree in the absence of any of these factors was not binding upon the appellants. We, therefore, vacated the decree and remanded the record to the court below with directions to the court en banc to prepare a decree in conformity with Pa.R.Civ.P. 1517. See Archbishop v. Karlak, 450 Pa. 535, 299 A.2d 294 (1973).
[3] The parties had stipulated previously that the chancellor could sit alone as the court en banc. See Archbishop v. Karlak, supra.
[4] We are buttressed in this conclusion by the text of the Act of June 20, 1935, P.L. 353, 10 P.S. § 81. That act vests control and disposition of church properties in the officers or authorities of the church, congregation or religious society having a controlling power according to the rules thereof; this control shall be exercised in accordance with and subject to the rules and regulations of the religious body, denomination or organization to which such church congregation or religious society shall belong, any provision in the charter to the contrary notwithstanding. The legislature was thus of the opinion that a charter provision providing for lay control of church property did not exclude the possibility of hierarchical control.