**In Re CHURCH OF ST. JAMES THE LESS.**

**Appeal of The Church of St. James The Less, Karl H. Spaeth, Gary E. Sugden, Becky S. Wilhoite and Robert Snead.**

Commonwealth Court of Pennsylvania.

Argued June 4, 2003.
Decided Oct. 7, 2003.

Jerome Shestack, Philadelphia, for appellant.

Mary E. Kohart, Philadelphia, for appellee.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge SMITH–RIBNER.

The Church of St. James the Less (Church), Karl H. Spaeth, Gary E. Sugden, Becky S. Wilhoite and Robert Snead appeal from an order of the Orphans' Court Division of the Court of Common Pleas of Philadelphia County that, *inter alia,* voided the attempted merger between the Church and a corporation known as the CJSL Foundation (Foundation), directed the return of parish property to the Episcopal Diocese of Pennsylvania (Diocese) as well as the removal of individual Appellants as vestrymen of the Church and ordered an accounting to assess damages related to bringing the lawsuit. The questions raised include: (1) whether, as stated in *Presbytery of Beaver–Butler of United Presbyterian Church in United States v.*

*Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317 (1985), and consistent with religious freedom guarantees contained in the First Amendment to the United States Constitution and in Article I, Section 3 of the Pennsylvania Constitution, the Church holds unimpaired title to its property with no trust interest in the Diocese; (2) whether the First Amendment and Article I, Section 3 preclude an interpretation of Section 7 of the Act of April 26, 1855, P.L. 328, *as amended,* 10 P.S. § 81, that gives the Diocese title to Church property; (3) whether the merger was a valid and proper corporate action; and (4) whether the vestrymen breached their fiduciary duty by approving the merger and submitting it to a parish vote.

I

The Church, presently a parish of sixty-five to eighty-five active adult members, was incorporated in 1846 as part of the Diocese and of the Episcopal Church in the United States (National Church), a hierarchical form of government consisting of three democratically elected tiers.[1] The Church's real property includes a church, church yard and burial ground, a sexton's house, a rectory, a parish house and day school and a memorial bell tower. Because of doctrinal and theological differences, on April 25, 1999 the vestry submitted a proposal to the membership to separate the Church from the Diocese and the National Church through merger of the existing Church corporation into the Foundation, which was incorporated solely for that purpose. In May 1999 the Bishop

of the Diocese and its Standing Committee declared the Diocese to be Trustee of the Church's real and personal property and ordered removal of the vestrymen. They filed suit to declare the merger invalid and to remove the vestrymen.

The Orphans' Court examined provisions of the corporate charter of the Church beginning in 1846 and as amended in 1919 and 1967 and provisions of National and Diocesan Canons. The court stated that as a consequence of its membership in the Episcopal hierarchy, all real and personal property of the Church was held subject to the control and disposition of the Standing Committee and the Bishop of the Diocese of Pennsylvania and in accordance with the laws of Pennsylvania, the Constitution and Canons of the National Church and of the Diocese. The court stressed the application of 10 P.S. § 81, which, as amended by Section 1 of the Act of June 20, 1935, P.L. 353 (Act of 1935), provides in part that whenever any property has been bequeathed, devised or conveyed to a corporation or person for use by a church for specified purposes, the same shall be held subject to the control and disposition of such authorities having a controlling power to be exercised "in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body, denomination or organization to which such church, congregation or religious society shall belong...." The court quoted Canon XII of the Diocese, adopted in 1941, which provided in part that no sale, conveyance or mortgage of church property devoted to specified uses

---

1. The Orphans' Court concluded that the Episcopal Church is hierarchical. The three tiers of government include the "parish level," which is governed by a twelve-person board of directors or vestry, elected by the membership at its annual meeting; the "diocesan level," which is governed by an annual Convention comprised of the diocesan and other bishops elected by the Convention, the rectors and other diocesan clergy and lay delegates elected by their parishes; and the "national level," which is governed by the General Convention consisting of a House of Bishops and a House of Deputies. Tr. Ct. op. at pp. 13, 17.

should be made by any parish without prior written consent of the Bishop and a majority of members of the Standing Committee of the Diocese.[2]

The Orphans' Court rejected the argument of the Church that it never adopted a given canon, stating that the canons were adopted for the Church with the full authority of state law. The court noted that under *Presbytery of Beaver-Butler*, a court need not defer to the determinations of the Bishop or Standing Committee as to matters of civil law. However, because testimony showed that the corporate purpose of the Foundation was clearly unauthorized and therefore invalid its formation was precluded. The Foundation was void at its inception, a by product of the deception of the vestrymen against the Department of State. The court described the required three-step process to effect a material change to the Church's articles of incorporation: submission of the change to a vote of the membership; submission to the Bishop and the Standing Committee of the Diocese; and submission to the Orphans' Court. If approved at all three stages, the changes might properly be submitted to the Secretary of State. Because the proper procedures were not followed, the merger never took place.

The Orphans' Court, however, did defer to the ecclesiastical finding of the Bishop and the Standing Committee that the vestrymen, by voting to disaffiliate

from the National Church, had rendered themselves ineligible to hold office under the provisions of the corporate charter. The court held that the vestrymen should be removed and that the legal title to the real property of the Church is held by the Bishop and the Standing Committee in trust for the Church for the benefit of its members and for the benefit of the Diocese.[3]

## II

The Church first asserts that the Orphans' Court departed from Pennsylvania law governing church property disputes and violated federal and state constitutional guarantees of religious liberty in awarding the Diocese title to and control of Church property. In *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the Supreme Court held that a state may not decide ecclesiastical matters, but it may constitutionally resolve church property disputes by applying "neutral principles of law." In *Presbytery of Beaver-Butler,* 507 Pa. at 266, 489 A.2d at 1323, the Pennsylvania Supreme Court firmly adopted this approach and mandated that when faced with a dispute between a denominational body and a local church over control of church property, the court will not defer to the denominational body but rather must "apply the same principles of law as would be applied to non-religious associations." The Church argues that the

---

2. The court also quoted the National Church's Canon I.7.4, known as the "Dennis Canon":

All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this [National] Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission, or Congregation otherwise existing over such property as long as the particular Parish,

Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons.

3. Appellate review of a decision of the Orphans' Court is to assure that the record is free from legal error and to determine if the findings are supported by competent and adequate evidence, not predicated upon capricious disbelief of competent and credible evidence. *In re Damario's Estate,* 488 Pa. 434, 412 A.2d 842 (1980).

Orphans' Court was required to apply the neutral principles of law prescribed in that case: whether the property deeds, the Church charter and the relevant National Church and Diocesan constitutions and canons demonstrate clear and unambiguous evidence that the Church intended to create a trust in favor of the National Church and the Diocese. The Church maintains that whether a denomination is hierarchical is irrelevant.

The Church also contends that the Orphans' Court misread 10 P.S. § 81 because nothing in the language of that act refers to creation of a trust in favor of the denomination where none has been expressly granted by the local church. The Church maintains that under the First and Fourteenth Amendments to the United States Constitution the state is prohibited from penalizing individuals for their religious beliefs. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). To like effect is Article I, Section 3 of the Pennsylvania Constitution. Awarding the Church's property to the Diocese penalizes the Church for exercising religious beliefs in that the Church's withdrawal from the National Church was for religious reasons: the Church adheres to more orthodox religious tenets than does the National Church. Under a separate heading the Church advances its closely related argument that pursuant to "neutral principles of law" analysis the Diocese has no claim to the property nor is it subject to any trust in favor of the Diocese. This Court has restated that under the "neutral principles" approach the burdened party must demonstrate "either (1) an actual transfer of property from the congregation to the hierarchical church body or (2) clear and unambiguous documentary evidence or conduct on the part of the congregation evincing an intent to create a trust in favor of the hierarchical church body." *Ortho-*

*dox Church of America v. Pavuk*, 114 Pa. Cmwlth. 176, 181, 538 A.2d 632, 634 (1988).

The Church asserts that provisions of its corporate charter do not evidence any intent to create a trust. Article II, Section 1 of the 1967 Charter provides that the purpose of the corporation is the support of the public worship of Almighty God according to the faith and discipline of the Protestant Episcopal Church in the United States of America and the Diocese of Pennsylvania. Article III declares that the parish "accedes to, recognizes and adopts the constitution, canons doctrines, discipline and worship" of the Protestant Episcopal Church and the constitution and canons of the Diocese, and Article VI, Section 2 excludes from membership any "person who shall disclaim or refuse conformity with and obedience to the constitution, canons, doctrines, discipline or worship of the Protestant Episcopal Church or of the Diocese...." Exhibit P–10. Similar language quoted from the Book of Order in *Presbytery of Beaver–Butler* was held to refer only to matters of spiritual development and not to evidence intent to create a trust.

According to the Church the canons of the National Church and Diocese do not grant the Diocese any trust interest in the Church's property. The Church's corporate charter was amended for the last time in 1967, which was more than a decade before the Dennis Canon was adopted in 1979. In 1967 the canons contained no express statement of a purported trust over local church property and the Church never expressly or implicitly acceded to the Dennis Canon, but rather disclaimed any accession. Furthermore, by voluntarily agreeing to be bound by the constitution and canons of the National Church, the Church did not bind itself to later-enacted

canons of which it had no notice at the time of accession. *See In re Petition of the Board of Directors of the State Police Civic Ass'n,* 80 Pa.Cmwlth. 405, 472 A.2d 731 (1984) (holding that when specific rights of member of beneficial association pursuant to contract become fixed, such as the vesting of a pension, subsequent amendments to bylaws or constitution may not affect those rights).

The Diocese responds that church property disputes may be and are decided by treating the dispute as one would treat a dispute between secular parties, and the court may consider not only deeds and contracts but also an organization's rules and applicable law relating to trusts. In *Jones v. Wolf* the Supreme Court held that a national church may enact canons at any time before property disputes erupt to ensure that factions loyal to the hierarchical church will retain the church property. Once a national church enacts such a provision, the civil courts will be bound to give it effect. *Id.* The Diocese asserts that the National Church did just that when it enacted the Dennis Canon. *See Trustees of the Diocese of Albany v. Trinity Episcopal Church of Gloversville,* 250 A.D.2d 282, 288, 684 N.Y.S.2d 76, 81 (N.Y.App.Div. 1999) ("[T]he 'Dennis Canon' amendment expressly codifies a trust relationship which has implicitly existed between the local parishes and their dioceses throughout the history of the Protestant Episcopal Church.").[4] Neither *Jones v. Wolf* nor *Presbytery of Beaver–Butler* requires that each parish expressly consent to each canon that its national church adopts.

■ The Diocese contends that the question of a trust in the Church's property in favor of the Diocese may be decided on the basis of the Dennis Canon alone, and the Court agrees. As the Diocese notes, the National Church adopted the Dennis Canon in the same year that *Jones v. Wolf* was decided. The language of the Dennis Canon, *see* n. 2 above, clearly establishes a trust in favor of the Diocese. The Church argues in part on the basis of *Presbytery of Donegal v. Calhoun,* 99 Pa. Cmwlth. 300, 513 A.2d 531 (1986), in which a local church learned in 1979 that its denomination intended to amend its constitution to impose a trust upon all congregational property in favor of the denomination, the local church immediately took steps to transfer its property to an independent corporation, and, when the local church became convinced that the Presbytery would take any necessary legal action to rescind the transfer, the local church immediately disaffiliated itself. As the Di-

---

4. The Court granted the application of the Diocese after oral argument for permission to submit the decision in *Daniel v. Wray,* 580 S.E.2d 711 (N.C.Ct.App.2003). In *Daniel* a local church seceded from the same National Church involved here, although a faction remained loyal and the diocese recognized their newly elected vestry as legitimate. The court stressed the hierarchical or "connectional" nature of the organization, under which as a general rule the parent body has the right to control property of local affiliated churches, and it held that the Dennis Canon and a diocesan canon providing for the immediate vesting of property of a parish in the trustees of the diocese in the event of dissolution of a parish applied. In *Daniel* the local church had adhered to the Constitutions and Canons of the National Church and the diocese for nearly fifty years. Here, despite the Church's reference to a 1995 letter in which the clerk of the vestry asserted to the Bishop that the Church had not agreed or acceded to policies, practices or changes adopted by the National Church or the Diocese since 1976, including the adoption of the 1979 Book of Common Prayer (while agreeing to pay the Diocesan assessment for the support of the Episcopate), St. James Ex. 45, it is clear that the Church remained subject to the Constitutions and Canons of the Diocese and the National Church for over 150 years.

ocese points out the Church waited twenty years after the adoption of the Dennis Canon to take action inconsistent with it.[5]

The Diocese argues that the Orphans' Court correctly applied 10 P.S. § 81 and that under this statute, the court must look to a church's rules in determining property disputes. *See Archbishop Most Reverend Metropolitan Ambrose Senyshyn v. Karlak*, 462 Pa. 348, 362, 341 A.2d 114, 120 (1975) (Roberts, J., dissenting) ("To the extent that [10 P.S. § 81] requires the courts of the Commonwealth to engage in inquiries forbidden by the First Amendment, it is simply invalid. However, the statute is entirely susceptible to a construction mandating the determination of such questions in the same manner as if the corporation involved were not a church corporation.").

## III

The Church asserts that the Orphans' Court erred as a matter of law, acted without evidentiary support and abused its discretion in declaring the merger of the Church with the Foundation to be void as an *ultra vires* corporate act. It contends that the merger was a legitimate means of accomplishing the separation of the Church from the Diocese. Because the Church's property always belonged exclusively to the Church, it had every right to disaffiliate in a manner that best protected its lawful property interests. Moreover, the merger did not require the approval of the Diocese or the Orphans' Court because it did not entail amendment to any of the Church's articles of incorporation. The Diocese submits that the merger could not have occurred, for it was impossible for the Church to merge into a non-existent or-

**5.** The Diocese asserts that other provisions evidence the creation of a trust, noting that this Court in *Conference of African Union First Colored Methodist Protestant Church v. Shell*, 659 A.2d 77 (Pa.Cmwlth.1995), quoted the principle from *Presbytery of Beaver–Butler* that no particular form of words or conduct is required to manifest the intention to create a trust. Specifically, the provisions in Articles II, III and VI of the Church's charter, mentioned above (as well as the explicit trust over the property of the parish in the event of a dissolution in Article IX, Section 3), evidence such intent. Further, Diocesan Canon 13 provides that property held by a parish is held "for the work of the Protestant Episcopal Church in the Diocese of Pennsylvania" and that the Diocese has ultimate control over whether the property may be sold, mortgaged or leased. In addition, National Church Canon I.7.3 prevents alienation of property without Diocesan consent. The Diocese contends that such provisions must be considered together to establish the parties' intent. As in *Conference of African Union First Colored Methodist Protestant Church* the record here conclusively demonstrates that a trust was created in favor of the denomination, that the Church was bound by rules governing the denomination and that, unlike certain other cases, the local Church failed to establish

through its articles of incorporation or otherwise an intent to retain possession and control of church property.

The Court observes that the Bishop and the Diocese as Petitioners submitted Ex. P 19, which was a letter of September 22, 1978 unanimously approved by the Rector, Wardens and Vestry of the Church to the Bishop, quoting Diocesan Canon 19.4 and inquiring whether procedures exist "by which the Church properties and assets of the Corporation of the Church of S. James the Less, now held in trust by the Church Foundation," might be transferred to be legally owned outright by the Parish Corporation, free and clear of any claims, conditions, or encumbrances of the Church Foundation, the Diocese of Pennsylvania or any organization affiliated with them. This is evidence that the Church understood perfectly well that its real property was held in trust. Further evidence that the Church never owned property that was not subject to the authority of the denomination comes from the minutes of the Diocesan Standing Committee showing that in 1852 the Church sought permission from the Diocese to lease property, and in 1854 the Church sought permission from the Diocese to mortgage property upon which it planned to build a rectory and hall. *See* Exs. P–2 and P–3.

ganization. The merger was further invalid under 15 Pa.C.S. § 5547, which requires Orphans' Court approval.[6] *See In re United Presbyterian Women's Ass'n of North America,* 30 Pa. D. & C.4th 217, 225 (1996) ("Section 5547 ... prohibits the diversion of the property from the purposes to which it has been committed, so long as that purpose remains possible.").

■ The Court agrees with the Orphans' Court and the Diocese that the Foundation was established for a purpose completely different than that of the Church, namely, to take the property claimed by the Church out of the Diocese. Whether or not this founding was an act of bad faith, movement of church property from the Church to the Foundation would plainly constitute a change of purpose requiring the Orphans' Court's approval.[7]

IV

As to the finding that the vestrymen acted in bad faith and breached their fiduciary duty in approving the merger, the Church contends that the Orphans' Court erred as a matter of law, acted without evidentiary support and abused its discretion. In addition, the court erred in imposing liability on twelve vestrymen when only four of them were parties to the

litigation. See *Township of Lycoming v. Shannon,* 780 A.2d 835 (Pa.Cmwlth.2001) (holding that jurisdiction of the court over a defendant is dependent upon proper service of the proceeding). Moreover, the vestrymen have a property interest in their positions, and for the court to remove them without due process is a constitutional violation. *See Pennsylvania Dental Ass'n v. Insurance Department,* 92 Pa. Cmwlth. 77, 498 A.2d 990 (1985), *aff'd in part,* 512 Pa. 217, 516 A.2d 647 (1986).

Section 5712(a) of the Nonprofit Corporation Law of 1988, 15 Pa.C.S. § 5712(a), provides in pertinent part that a director of a nonprofit corporation stands in a fiduciary relation to the corporation and must perform his or her duties in good faith and in the best interests of the corporation, and the director shall be entitled to rely in good faith on the information, opinions, reports or statements prepared or presented by counsel. The Church states that the record shows that the vestrymen believed that what was best for the members of the Church was for the parish to continue to function as a viable faith community in its present location in the Orthodox Anglican tradition. The members of the vestry believed they had the right to disaffiliate, and they sought and followed the advice of counsel, who identified the

---

**6.** Section 5547(b), *as amended,* 15 Pa.C.S. § 5547(b), provides:

Property committed to charitable purposes shall not, by any proceeding under Chapter 59 (relating to fundamental changes) or otherwise, be diverted from the objects to which it was donated, granted or devised, unless and until the board of directors or other body obtains from the court an order under 20 Pa.C.S. Ch. 61 (relating to estates) specifying the disposition of the property.

**7.** In a reply brief the Church argues that Section 5547 was not involved as there was no diversion from the objects to which the property was donated, granted or devised as the property was given for the support of the

Church and with the Church it remains. The Court rejects this position inasmuch as property given to the Church as a unit of the hierarchical National Church and subject to its control was not given to a wholly independent entity subject to no control.

The Church further posits that the merger was approved by a valid majority vote of the parishioners of the Church; however, the Orphans' Court stated that the record did not establish that a quorum was present and also that unanswered questions remained regarding the actual vote taken. The Church asserts that the court raised the issue of a quorum *sua sponte* and misplaced the burden of proof. In view of its holding, the Court concludes that this question is moot.

merger as the best option and who advised that a merger would not involve amendment of articles of incorporation subject to Diocesan approval. They rejected counsel's suggestion, however, of bringing a quiet title action as such action against fellow Christians would not be consistent with scripture.

 The Orphans' Court found that the vestrymen acted to promote their own interest, but even had their purpose been proper, their method of acting was a violation of their fiduciary duty. The Diocese notes that the court made first-hand credibility determinations and found that the advice of the Church's counsel was to file a quiet title action rather than to proceed with the merger. In acting against this advice the vestrymen acted in bad faith. The Diocese does not deny that the absence of non-party members of the vestry precludes monetary relief against them, but it correctly asserts that this fact has no effect on the power of the court or the rights of those parties before it. It is axiomatic that directors and officers of a corporation are jointly as well as severally liable for misconduct of corporate affairs if they jointly participate in a breach of fiduciary duty. *Seaboard Indus., Inc. v. Monaco*, 442 Pa. 256, 276 A.2d 305 (1971). The Court agrees that no damages may be assessed by the Orphans' Court against the non-party vestrymen. In all other respects, however, the Orphans' Court's findings regarding bad faith and breach of fiduciary duty are amply supported by the record and its conclusions of law are sound. The Court accordingly affirms the order of the Orphans' Court.

### ORDER

AND NOW, this 7th day of October, 2003, the order of the Court of Common Pleas of Philadelphia County is affirmed.

DISSENTING OPINION BY President Judge COLINS.

I respectfully dissent to the majority's decision to strip the Church of St. James the Less of its property and to award it to the Diocese.

The Church of St. James the Less (St. James) was founded in 1846 by laymen living in the East Falls/Allegheny West area of Philadelphia. St. James remains on the property where it was founded. Improvements consist of a church building, a sexton's house, a rectory, a parish hall and day school, a bell tower and a burial ground. The real and personal property of St. James has been acquired through donations by parishioners and by purchases made with funds donated by parishioners. The deeds for the real property of St. James indicate that St. James is and has always been the fee simple owner of its real property.

The Diocese is one of over 100 dioceses of the Episcopal Church in the United States (ECUS). The ECUS and the Diocese are governed by separate, consistent constitutions and canons. There is a hierarchical structure to the Episcopal Church by which parishes are affiliated with a diocese and the diocese with the ECUS, but no central body or prelate is able to exercise authority over Diocesan affairs. Individual parishes within the ECUS possess broad powers to conduct their own affairs.[1] In recent years, issues such as the ordination of women and the open acceptance of homosexuality within the priesthood have caused a widening breach between the Diocese and traditional parishes such as St. James. The traditional parishes consider the Bible to be revealed

---

1. This structure is in stark contrast to the Roman Catholic Church, which exercises a rigid hierarchical control over parish affairs that extends in a direct line up to the Pope.

truth; more liberal parishes and the Diocese view it as a guide to a personal religious interpretation. This breach between the Diocese and St. James resulted in the separation of St. James from the Diocese in April 1999. The separation was effected by the merger of the original corporation of St. James into a new non-profit corporation established for that purpose. The merger took effect after an almost unanimous vote of the membership on April 25, 1999. The merger merely separated St. James from the diocese and the ECUS; it did not affect the day-to-day operation of St. James. In May, 1999, subsequent to the merger, the Bishop and the Standing Committee of the Diocese, ostensibly acting pursuant to Diocesan Canon 13.4,[2] declared the Diocese to be the trustee of the real and personal property of St. James and sought a ruling to that effect from the Orphan's Court. The Orphan's Court agreed, and St. James filed this appeal.

The questions we are asked to address are: 1) whether St. James holds unimpaired title to its real property free of any trust interest in favor of the Diocese; 2) whether the First Amendment to the U.S. Constitution and Article 1, Section 3 of the Pennsylvania Constitution preclude an interpretation of 10 P.S. § 81 (Act of 1935) that gives title and control of the real property of St. James to the Diocese; 3) whether the merger of St. James with the

CSJL Foundation (the Foundation) was a valid and proper corporate action; and 4) whether the members of the Vestry of St. James breached their fiduciary duty to St. James by approving a merger of St. James with CSLJ and submitting that merger to a vote of the parishioners of St. James.

The trial court found that an express trust existed because the ECUS placed explicit trust language in its Constitution and Canons at Canon 17.4[3] ("the Dennis Canon") pursuant to the U.S. Supreme Court opinion in *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). In reaching this conclusion, the majority misconstrues *Jones v. Wolf* because the case simply does not and cannot support such a conclusion. Here is what the majority said,

> In *Jones v. Wolf* the Supreme Court held that a national church may enact canons at any time before property disputes erupt to ensure that factions loyal to the hierarchical church will *retain* the church property. Once a national church enacts such a provision the civil courts will be bound to give it effect. (Emphasis added.)

Majority opinion at 324.

*Jones v. Wolf*, however, does not say that "a national church may enact canons...." It *suggests* that a national church and its individual parishes should *jointly*

---

**2.** Entitled *Providing for a Trustee for Corporations Unable to Function*, this Canon provides, inter alia, that the Diocese will take under trust any parish property from a parish which, in the sole discretion of the Bishop and the Standing Committee of the Diocese, "has ceased to act in accordance with the Constitution, Canons, doctrine, discipline, and worship of the Episcopal Church and the Constitution and Canons of this Diocese ... anything in the articles or by-laws of such incorporated body to the contrary notwithstanding...."

**3.** The Dennis Canon states,

All real and personal property held by or for the benefit of any Parish, Mission, or Congregation is held in trust for this Church and the Diocese thereof in which such parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish Mission, or congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons. ["Church" refers to the ECUS]

agree that, in the event of a schism *within a parish* the faction loyal to the national church will retain control of the church property. The facts of *Jones v. Wolf* are starkly distinct from this case, and the majority's reliance on its misreading of *Jones* has lead it to a conclusion that is not only unsupported by the language of *Jones* but that is in clear conflict with our own well-settled law of trusts. *Jones* dealt with a schism *within* a parish, not a conflict between a parish and a denomination. In the instant matter, the national church had no property to "retain." One faction in *Jones* wanted to disaffiliate with the denomination, one wanted to remain with it and both claimed the real and personal property of the parish. The holding in *Jones* established the principle that the First Amendment does not require a state to compulsorily defer to religious authority in resolving church property disputes, but that civil courts were to resolve property disputes within religious denominations by the application of neutral principles of law.

The Dennis Canon arose from dicta in *Jones* in which the court *suggested* that denominations which wished to avoid the type of dispute addressed there should adopt language in the constitution of the denomination *agreeable to both parties*, the denomination and the local parish, by which the denomination would retain control over the property in trust for the loyal faction. One thing that *Jones* did *not* do was to sanction, or even suggest that a denomination could impose a trust on parish property by the unilateral amendment of its governing documents. Thus, the majority relies on dicta in *Jones* to strip St. James of land that it has held solely in its name for generations while ignoring that the holding in *Jones* established the principle that the First Amendment does not require a state to compulsorily defer to religious authority in resolving church property disputes, but that civil courts

were free to resolve property disputes within religious denominations by the application of neutral principles of law. If we follow *Jones*, as we must, and apply "neutral principles" of law, we reach the inescapable conclusion that St James remains the owner of its property. *Jones* was decided July 2, 1979; the Dennis Canon was adopted by the ECUS at its General Convention on September 12, 1979. Appellees tell us, "There is no evidence that the proposed [Dennis] canon was circulated to local parishes prior to its adoption, nor that anyone from St. James was present when it was adopted. (R. 197a, 230–31a)." Reply Brief of St. James at 3, fn. 1. There is no schism within St. James; there is no faction loyal to the Diocese. The entire parish disaffiliated from the Diocese in 1999, just as freely as it had affiliated with it in 1846.

The majority's misreading of *Jones* also leads it to turn our law of trusts on its head when it concludes that a beneficiary can, as the Dennis Canon purports, unilaterally create a trust. There is simply no mechanism by which a beneficiary can create a trust in Pennsylvania without the explicit consent and cooperation of the settlor. A trust may be created only by clear and unambiguous language on the part of the *settlor* (St.James) and not on the part of the *beneficiary* (the Diocese). Here is what our Supreme Court said in the controlling case on this issue, *Presbytery of Beaver–Butler of the United Presbyterian Church v. Middlesex Presbyterian Church*, 507 Pa. 255, 489 A.2d 1317 (1985), *cert. denied*, 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985).

> In order for a court to find that a trust has been created there must exist in the record clear and unambiguous language or conduct evidencing the intent to create the trust. This Court has previously held:

No particular form of words or conduct is required to manifest the intention to create a trust. Such manifestation of intention may be written or spoken words or conduct indicating that settlor intended to create a trust. (Citations omitted.) Nevertheless, lack of formality does not obviate the necessity for the appearance of all the elements of a completed trust. Every trust symptom must be present, regardless of the informality surrounding the inception of the relationship, or none exists. A trust must be created by clear and unambiguous language or conduct, it cannot arise from loose statements admitting possible inferences consistent with other relationships. [Emphasis in original omitted].

*Bair v. Snyder County State Bank,* 314 Pa. 85, 89, 171 A. 274, 275 (1934).

In conducting this inquiry the primary focus must be on the intent of the settlor at the time of the creation of the alleged trust. See § 45 Bogert, Trusts and Trustees, p. 457 (2nd ed.1984); Restatement, Second, Trusts § 23. The putative settlor in this case was clearly Middlesex. *In support of this conclusion we note that the Middlesex church was not a creation or offshoot of the central denomination. Rather, the record establishes that the Middlesex church was created and incorporated on the local level by members of the parish; and that all property was retained in the corporate name of the local church.*

507 Pa. at 268–69, 489 A.2d at 1324 (Emphasis added).

To paraphrase: "The putative settlor in this case was clearly [St. James]. In support of this conclusion we note that [St. James] was not a creation or offshoot of the central denomination. Rather, the record establishes that [St. James] was created and incorporated on the local level by members of the parish; and that all property was retained in the corporate name of the local church."

The court in *Beaver–Butler* goes on to conclude,

The denomination here has cited no evidence that Middlesex ever intended to convey their property interests to them. To the contrary, throughout their entire affiliation Middlesex retained all property in their own corporate name. The Commonwealth Court's reliance on selected passages from the Book of Order was misplaced in that the court ignored the overall intent of that book as a means of overseeing the *spiritual* development of member churches. In addition, these selected provisions, which at most evidence the putative trustee's desired interpretation, are far from constituting the clear unequivocal evidence necessary to support a conclusion that a trust existed.

507 Pa. at 269–70, 489 A.2d at 1325.

Simply substitute Diocese for denomination and St. James for Middlesex and you have the conclusion that should be reached in this case.

The majority compounds the error of its misreading of *Jones* by concluding that St. James is bound by the Dennis Canon because it did not "opt-out" of the Canon by leaving the Diocese when the Canon was enacted. By law, the only way that St. James could have been bound by the Canon would have been if it had given its "clear and unambiguous" consent to being bound by it. No amount of silence on the part of St. James could have acted to create the trust that the majority would so easily impose.

Our Supreme Court overruled this Court in reaching its decision in *Beaver–Butler.* Our Supreme Court found that

we erred when we found that the statute at issue here, 10 P.S. § 81, Act of 1935, created a trust in favor of the denomination (diocese). We said "The Act of 1935 provides that the control of local congregations over property is subject to the regulations of and requirements of the denomination of which it is a part. . . . [N]eutral principles include consideration of the applicable statutes and the applicable Pennsylvania statute requires that the [decision in favor of the denomination] be upheld." 80 Pa.Cmwlth. 211, 471 A.2d 1271, 1279 (1984) (citations omitted). In reversing us, the Supreme Court did not specifically address the Act of 1935 but it did reject any reasoning based on it or that would lead to it. The neutral principles approach and the Act of 1935 are simply incompatible. If we apply "neutral principles" to this case we reach the conclusion that a trust does not and cannot exist and that St. James is the fee simple owner of its property. The Act of 1935 violates the neutral principles approach enunciated in *Jones* that was derived from the U.S. Supreme Court's examination of the First Amendment as it applied to church property disputes. I would find that the Act of 1935 violates both the United States and the Pennsylvania Constitutions because it defers to ecclesiastical law over civil law in violation of the neutral principles approach enunciated in *Jones*.

The majority's initial mistake of fact, that St. James was formed as part of the Diocese, when it actually joined the Diocese after it was incorporated, has led it to err in its conclusions regarding the actions taken by the vestry to disaffiliate St. James from the Diocese.

Here is what the majority said about the establishment and purpose of the Foundation

The Court agrees with the Orphans' Court and the Diocese that the Founda-

tion was established for a purpose completely different than that of the Church, namely, to take the property claimed by the Church out of the Diocese. Whether or not this founding [sic] was an act of bad faith, movement of church property from the Church to the Foundation would plainly constitute a change of purpose requiring the Orphans' Court's approval.

Majority opinion at 325.

The majority bases this conclusion on its reading of 15 Pa.C.S. § 5547(b) which provides,

Property committed to charitable purposes shall not, by any proceeding under Chapter 59 (relating to fundamental changes) or otherwise, be diverted from the objects to which it was donated, granted or devised unless and until the board of directors or other body obtains from the court an order under 20 Pa. C.S. Ch 61 (relating to estates) specifying the disposition of the property.

St. James, however, was not, as the majority concludes, required to seek Orphans' Court approval before it disaffiliated from the Diocese because the purposes for which St. James was incorporated did not change when it affiliated with the Diocese and there is no evidence in the record that those purposes changed when it disaffiliated from the Diocese. In a footnote, the majority "rejects this position inasmuch as property given to the Church as a unit of the hierarchical National Church and subject to its control was not given to a wholly independent entity subject to no control." (Majority opinion at 10, fn. 7) This is circular reasoning; it assumes the facts necessary to support the ultimate conclusion—that the Diocese controlled the property of St. James. This is not a fact in evidence-it is the heart of the dispute before this Court. The Diocese never controlled the property; it has always been

held in fee simple by St. James. The only way that the majority can reach its conclusion above is to assume that the Diocese is correct. Establishing the Foundation did not change the purpose for which St. James was incorporated, it was merely a mechanism by which St. James was able to stay true to its original purpose.

Finally, the majority errs once again when it addresses the question of whether the Vestry breached its fiduciary duty to the parishioners. The majority concludes that the Vestry breached its duty solely because it decided to merge the original corporation into the Foundation rather than file a quiet title action. The majority makes this remarkable statement in its opinion, "The Diocese notes that the court made first-hand credibility determinations and found that the advice of the Church's counsel was to file a quiet title action rather than to proceed with the merger. In acting against this advice the vestrymen acted in bad faith." The majority cites no law to support this conclusion and I am unaware of any that could be cited. A client is free to accept or reject the advice of counsel and, even if a client rejects good advice in favor of bad, which has not been shown here, that, without more, is not an act of bad faith. A showing of bad faith must be based on some extrinsic evidence that demonstrates that the choice was made knowingly against the best interests of the corporation, something that both the trial court and the majority have failed to do in this case.

Having addressed my differences with the majority's conclusions on corporate law, I am constrained to point out that it was not the business of the Diocese or the trial court to question St. James on its conduct of its corporate affairs. The parties with the standing to object to the merger are the parishioners of St. James, and the record reveals absolutely no objec-

tion or even the suggestion of an objection on the part of the parishioners or anyone affiliated with St. James. The same is true of questioning the members of the Vestry on their fiduciary duty. The parishioners have standing to question the Vestry on its duty to them, the Diocese does not, and there is no suggestion in the record the petitioners raised the question.

For all the above reasons, I must respectfully dissent from the well-argued opinion of the majority and would reverse the trial court *in toto*.