A.2d 795

### In re CHURCH OF ST. JAMES THE LESS.

**Appeal of the Church of St. James the Less, Karl H. Spaeth, Gary E. Sugden, Becky S. Wilhoite and Robert Snead.**

Supreme Court of Pennsylvania.

Argued March 9, 2005.

Decided Dec. 29, 2005.

Jerome J. Shestack, Philadelphia, Brad Patrick Bender, Valerie J. Munson, Philadelphia, for Church of St. James the Less, Karl Spaeth, Gary Sugden, Becky Wilhoite and Robert Snead.

Adam E. Lyons, William C. Bullitt, Mary Elizabeth Kohart, Philadelphia, Meghan Cherner–Ranft, New York, NY, for Episcopal Diocese of PA and Bishop Charles E. Bennison, Jr.

Heather Anderson, Adam Braverman, The Episcopal Church.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, EAKIN and BAER, JJ.

## *OPINION*

Justice NIGRO.

The issue presented in this appeal is whether the property of the Church of St. James the Less ("St. James") is subject to

a trust interest in favor of the Protestant Episcopal Church of the Diocese of Pennsylvania (the "Diocese"). The Commonwealth Court concluded that St. James' property was subject to such a trust and we now agree with that conclusion.

St. James was founded in April 1846 when a group of Episcopalians met and decided to form a new Episcopal church named St. James the Less in what-is-now the East Falls section of Philadelphia. *See* Exh. P–57 at 3. In accordance with the practices of the Diocese and the Protestant Episcopal Church of the United States (the "National Episcopal Church"), the group chose twelve men to serve as the new church's board of directors or "vestry," elected a rector, and proceeded to adopt a charter of incorporation (the "Charter") and by-laws. *See id.* at 3–4.

The Charter declared that St. James' purpose was to "[worship] Almighty God according to the faith and discipline of the [National Episcopal Church]." Exh. P–16 at 5, 6. Article II of the Charter further established St. James' allegiance to the Diocese and the National Episcopal Church, stating that St. James was a member of the Diocese and the National Episcopal Church, that St. James acceded to the Diocesan and the National Episcopal Church's constitution and canons, and that St. James' members had to accept the authority of the Diocese and the National Episcopal Church.[1] *See* Exh. P–16 at 6. Moreover, Article IV of the Charter indicated that St. James would not alienate any of its property without the Diocese's consent.[2] *See id.* at 7.

---

1. Specifically, Article II stated:

    This Church acknowledges itself to be a member of, and to belong to, the [Diocese and the National Episcopal Church]. As such, it accedes to, recognizes, and adopts the constitution, canons, doctrine, discipline, and worship of the [Diocese and the National Episcopal Church], and acknowledges their authority accordingly.

    Any member of this Church or Corporation, who shall disclaim, or refuse conformity to, the said authority, shall cease to be a member of this Corporation, and shall not be elected, or vote in the election of Vestrymen, or exercise any office or function in, concerning, or connected with the said Church or Corporation.

    Exh. P–16 at 6.

2. This provision provided:

After completing the Charter, the vestry submitted it to the Diocesan Bishop and Standing Committee for their approval.[3] *See* Exh. P–1. The Bishop and Standing Committee approved the Charter, finding that it conformed to the Diocesan constitution and canons, and thereby admitted St. James into the Diocese in May 1846.[4] *See* Exhs. P–1 at SJ–3400, P–72 at SJ–0116, P–49 at canon XV. Four months later, in September 1846, St. James was officially incorporated pursuant to a decree issued by the trial court. *See* Exh. P–16 at 10.

In October 1846, St. James acquired its first parcel of land, upon which it erected a church structure four years later.[5] *See* Exhs. P–11, P–57 at 4–5, SJ–1. Between 1850 and 1923, St. James obtained four more plots of land in the area surrounding the church, which it used for a churchyard/burial ground, a rectory/school house, a sexton's house, a parish house, and a bell tower.[6] *See* Exhs. P–12, P–15, and P–57 at 6–15. Notably, even prior to the creation of the churchyard, St. James adopted a resolution to offer the Diocesan Bishop a burial plot

> The said Corporation shall not, by deed, fine, or recovery, or by any other means, without the assent of the [Diocese], previously had and obtained, grant, sell, alien, or otherwise dispose of any lands, messuages, tenements, or hereditaments in them vested, nor charge nor encumber the same to any person or persons whomsoever.
> Exh. P–16 at 7.

3. The Diocesan Bishop and Standing Committee act as a governing body for the Diocese. *See* Exhs. P–60 at pp. 3–5, P–53 at pp. 7–10, 18, 24, 37–40, N.T., 10/16/2002 at 161–63. The Standing Committee includes five clerical and five lay members of the Diocese, all of whom are elected by representatives of the Diocesan parishes during an annual convention. *See* Exh. P–53 at pp. 9–10, N.T., 10/16/2002 at 163.

4. By virtue of its admission into the Diocese, St. James also became a part of the National Episcopal Church. *See* Exh. P–40 at SJ–2208.

5. Once the church was built, it was consecrated by the Right Reverend Bishop Potter of the Diocese. Exhs. P–57 at 7, SJ–16 at 81. Moreover, during the consecration service, St. James' rector dedicated the structure to the Bishop and the Diocese on behalf of Almighty God. *See* Exh. SJ–16, at 81.

6. St. James obtained mortgages on its property at least twice during this time period. *See* Exhs. P–3 at SJ–3259–60, P–4 at SJ–3262. Furthermore, in accordance with Article IV of its Charter, St. James received the Standing Committee's approval prior to obtaining both mortgages. *See id.*

in the churchyard. *See* Exh. P–57 at 6. This practice continued until at least 1923, and at least three Diocesan Bishops accepted St. James' offer, namely, Bishops Onderdonk, Stevens, and Whittaker. *See id.*

St. James made minor amendments to its Charter in 1919 and again in 1967. In accordance with the Diocesan canons, it obtained the Diocese's approval for each set of amendments before filing them with the trial court. *See* Exhs. P–50 at canon I, § II, P–5 at SJ–3270, P–17, P–9 at SJ–3277–78. Significantly, the amendments did not change St. James' allegiance to the Diocese or the National Episcopal Church.[7] *See* Exhs. P–17, P–9.

St. James appears to have remained an active participant in the annual Diocesan Conventions until at least 1977.[8] *See* Exh. P–46. In 1977, however, when St. James sent lay representatives to the Diocesan Convention, they were not permitted to vote because St. James had not paid its annual assessment to the Diocese.[9] *See id.* Over the next five years, St. James did not send any clerical or lay representatives to the Diocesan Convention. *See id.* During this same time period, St. James sent a letter to the Diocesan Bishop, the Right Reverend Lyman C. Ogilby, inquiring "whether procedures exist by which [St. James' properties and assets], now held in trust by the Church Foundation, may be transferred to be

7. While the 1919 amendments removed the alienation provision that was in St. James' original Charter, they also added a provision stating that if St. James were to dissolve, its property would be placed in a trust "for some existing or future Congregation of Members of the [Diocese]." Exh. P–17. Moreover, by acceding to the Diocesan and National Episcopal Church's canons in its 1967 amended Charter, St. James agreed to the alienation provisions in those canons, which not only required St. James to obtain the Diocese's consent before alienating its property, but also to hold its property "for the work of the [Diocese]." Exh. P–51 at canon XII, § II; *see also* Exh. P–43 at canons 6.3, 25.2.

8. The record indicates that St. James sent lay representatives to the annual Diocesan Conventions regularly between 1848 and 1977. *See* Exh. P–46.

9. Churches affiliated with the Diocese are required to pay an annual assessment "for the support of the episcopate in the Diocese during the ensuing calendar year." Exh. P–53 at canon 7.2.1.

legally owned outright by the Parish Corporation, free and clear of any claims, conditions or encumbrances of the Church Foundation, the [Diocese], or any organization affiliated with the same." Exh. P–19. In response, an attorney for the Bishop explained that St. James held title to its property, but that the property was held in trust for the Diocese and therefore, could not be held free of the Diocese's claims. *See* Exh. P–20.

St. James resumed sending lay representatives to the annual Diocesan Convention in 1983 and continued to do so for six more years, after which it apparently stopped sending representatives altogether. *See* Exh. P–46. In March 1995, St. James entered into an agreement with the Diocesan Bishop, the Right Reverend Allen L. Bartlett, in which it agreed to pay the Diocesan assessment in exchange for Bishop Bartlett's agreement to send Bishop Donald Parsons, an apostolistic bishop, to St. James to perform the visitations required by the National Episcopal Church's canons.[10] *See* Exhs. SJ–44, SJ–45, SJ–46. At the same time that it entered into this agreement and reaffirmed that it remained a part of the Diocese and the National Episcopal Church, however, St. James also advised the Diocese that it did not agree "either explicitly or implicitly, [to] any of the policies, practices, positions or changes that were adopted by [the National Episcopal Church] or the [Diocese] in 1976 or thereafter." [11] Exh. SJ–45.

**10.** According to the National Episcopal Church's canons, every Diocesan bishop has to visit all of the congregations within his diocese at least once every three years "for the purposes of examining their condition, inspecting the behavior of the Clergy, administering Confirmation, preaching the Word, and at his discretion celebrating the Sacrament of the Lord's supper." Exh. P–41 at canon 13, § II. St. James objected to these visits by Bishop Bartlett because he was not an "apostolistic" bishop who abided by certain Anglo–Catholic principles which were important to the members of St. James.

**11.** Specifically, in a March 1995 letter to the Diocese, St. James stated as follows:

As we are sure you will understand, we will not agree to any proposal that we consider contrary to the basic principles and faith which characterize and define the Church of St. James the Less.

In 1997, the above agreement expired and the new Diocesan Bishop, Bishop Charles E. Bennison, refused to renew it. *See* Exh. SJ–44, N/T, 10/16/2002 at 189, 240. For this as well as other reasons, St. James' vestry began considering whether it was necessary for St. James to separate from the Diocese and the National Episcopal Church. *See* N/T, 10/16/2002 at 203. However, the vestry knew that it would be difficult for St. James to separate while retaining its property because of the Diocesan and the National Episcopal Church's canons which placed St. James' property in trust for those entities. *See id.* at 252–53, Exhs. P–54, P–20. Attempting to avoid this problem, St. James' counsel suggested that St. James merge into a new nonprofit corporation with no ties to the Diocese or the National Episcopal Church.[12] *See* N/T, 10/15/2002 at 202–05,

> In this regard, we think it may be useful to note that Saint James the Less is a unique parish, established in 1846 in the Anglo–Catholic tradition to serve Anglo–Catholics in the greater Philadelphia area. It has remained true to that mission to the present. It has also remained true to the Anglican traditions as embodied in the 1928 Book of Prayer, and, *while remaining part of the [National Episcopal Church], we have not agreed to or acceded to, either explicitly or implicitly, any of the policies, practices, positions, or changes that were adopted by [the National Episcopal Church] or the [Diocese] in 1976 or thereafter ....*
>
> To date, you and your predecessors have accepted our particular position with a genuine understanding for our dilemma, as *we have no desire to leave [the National Episcopal Church] but also seek to remain true to the orthodox Anglican traditions and viewpoints that define our very being ....*
>
> After much discussion, we have decided to accept your proposal to pay the Diocesan Assessment for the support of the Episcopate, because we have concluded that doing so will not compromise our principles and will provide a framework for Saint James the Less ... to function in a way that will be supportive of and reinforce the role of orthodox Anglican traditions in today's church. Most specifically, we regard payment of an assessment as an administrative matter to provide the [Diocese] with funds necessary to pay the costs associated with bringing Bishop Parsons to Pennsylvania so that he may act as and provide a Bishop's oversight for each of the parishes that accept your proposal.
>
> Exh. SJ–45 (emphasis added).

12. The record indicates that although St. James' counsel suggested the merger plan to the vestry, he also advised the vestry that the merger plan was suspect and that a better plan would be to file a quiet title action against the Diocese. *See* Exh. P–54. The vestry, however, decided to proceed with the merger plan. *See id.*

242–43, Exh. P–54. In accordance with this suggestion, in August 1997, Appellant Karl H. Spaeth, a member of St. James' vestry, filed articles of incorporation and bylaws with the Department of State to create a new nonprofit corporation named the CSJL Foundation into which St. James could merge.[13] *See* Exh. P–22.

Two years later, in February 1999, St. James' vestry adopted a plan to merge St. James into the CSJL Foundation. *See* Exh. P–27. The vestry subsequently held a meeting at which they presented their merger plan to St. James' members for a vote. *See* N/T, 10/16/2002 at 212–15, Exhs. P–27, P–54. After a majority of the members present at the meeting voted in favor of the plan, the vestry filed the appropriate documents with the Department of State to merge St. James into the CSJL Foundation. *See* N/T. 10/16/2002 at 212–13, Exh. P–54. Once the merger was complete, the vestry changed the name of the CSJL Foundation to the Church of St. James the Less so that the only difference between the new and old churches was that the new church's corporate charter did not recognize a relationship with the Diocese or the National Episcopal Church. *See* Exh. P–36.

Shortly after the merger, Bishop Bennison and the Diocesan Standing Committee resolved that (1) St. James' vestry and members had rendered themselves ineligible to act on St. James' behalf by refusing to support the Diocese and the National Episcopal Church; and (2) St. James had become incapable of corporate action and effectively dissolved due to the merger. *See* Exh. P–47. They therefore declared that Bishop Bennison was the trustee of St. James property pursuant to Diocesan canon 13.4, which permits the Bishop to become the trustee of a church that has legally dissolved and become incapable of corporate action.[14]

13. According to the CSJL Foundation's bylaws, its purpose was "to provide and maintain a place for worship and religious instruction in Traditional Biblical and Anglican Principles." Exh. P–22.

14. Canon 13.4 provides in pertinent part:

Providing a Trustee for Corporations Unable to Function

As St. James refused to abide by the above resolution, the Diocese and Bishop Bennison filed the instant action in the trial court, requesting the court to declare, among other things, that (1) St. James had effectively dissolved; (2) the merger between St. James and the CSJL Foundation was null and void; and (3) the Bishop was the trustee of St. James' property. Following a hearing, the trial court entered an order on March 10, 2003, denying the Diocese and Bishop's first request, *i.e.*, declaring that St. James had not dissolved, but granting the Diocese and Bishop's latter two requests, *i.e.*, declaring that the merger was void and that the Bishop was the trustee of St. James' property.[15] *See In re: St. James the Less*, 2003 WL 22053337 at *21 (Pa.Com.Pl.2003).

In an opinion issued with its order, the trial court explained that the merger between St. James and the CSJL Foundation was invalid for several reasons, including because St. James had failed to obtain both the Diocese's and the court's approv-

Whenever any property, real or personal, has heretofore been or shall hereafter be bequeathed, devised or conveyed to, or be in any manner in the lawful possession of any incorporated body, for use in connection with the work of the Episcopal Church in this Diocese, and such incorporated body

(a) through loss of membership or otherwise is, or shall become, incapable of corporate action, or

(b) in the determination of the Standing Committee has, in fact, discontinued normal exercise of corporate functions, or

. . .

(d) shall legally dissolve, or

(e) in the determination of the Bishop, with the advice and consent of the Standing Committee, has ceased to act in accordance with the Constitution, Canons, doctrine, discipline, and worship of The Episcopal Church and the Constitution and Canons of this Diocese, then the Ecclesiastical Authority, anything in the articles of incorporation or by-laws of such incorporated body to the contrary notwithstanding, shall be trustee thereof . . .

Exh. P–53. Notably, the Diocese enacted this canon some time after 1967, when St. James last amended its Charter.

15. The trial court also ordered that (1) St. James' vestry be removed from their offices in accordance with the Bishop and Standing Committee's resolution; (2) the vestry had violated their fiduciary duties to St. James by advocating and adopting the merger plan; and (3) the vestry was liable for the damages incurred as a result of the merger and subsequent lawsuit. *See In re: St. James the Less*, 2003 WL 22053337 at *17–*21.

al for the merger plan.[16] *See id.* at \*12–\*14. The trial court then found that St. James had not dissolved by virtue of its unsuccessful attempt to merge into the CSJL Foundation because a corporation could not dissolve merely as a result of a failed merger.[17] *See id.* at \*14.

In defining the interest that the Bishop and the Standing Committee held in St. James' property, the trial court pointed out that section 81 of the Charities and Welfare Act, 10 P.S. § 81 (the "Act of 1935"), requires local churches affiliated with a national church to hold their property in accordance with the rules of the national church with which they are associated.[18]

16. The court also found that the merger was invalid because (1) Pennsylvania law requires a quorum of all of the members of a nonprofit corporation to be present at a meeting to transact business and the evidence did not sufficiently establish that a quorum of St. James' members was present at the merger meeting; and (2) the CSJL Foundation was never effectively formed as an independent corporation because its corporate purpose *i.e.*, to serve as a mechanism by which St. James could disaffiliate from the Diocese with its property, was unauthorized by the laws of Pennsylvania. *See In re: St. James the Less*, 2003 WL 22053337 at \*13, \*15; 15 Pa.C.S. § 5756.

17. Citing to Black's Law Dictionary, the court explained that a corporate dissolution only occurs under certain specific circumstances, such as by surrender or expiration of a charter, loss of members, or bankruptcy. *See In re: St. James the Less*, 2003 WL 22053337 at \*14 (citing Black's Law Dictionary 425 (5th ed.1979)).

18. This statute states:

Whensoever any property, real or personal, has heretofore been or shall hereafter be bequeathed, devised, or conveyed to any ecclesiastical corporation, bishop, ecclesiastic, or other person, for the use of any church, congregation, or religious society, for or in trust for religious worship or sepulture, or for use by said church, congregation, or religious society, for a school, educational institution, convent, rectory, parsonage, hall, auditorium, or the maintenance of any of these, the same shall be taken and held subject to the control and disposition of such officers or authorities of such church, congregation, or religious society, having a controlling power according to the rules, regulations, usages, or corporate requirements of such church, congregation, or religious society, *which control and disposition shall be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the religious body, denomination or organization to which such church, congregation, or religious society shall belong,* but nothing herein contained shall authorize the diversion of any property from the purposes, uses, and trusts to which it may have been heretofore lawfully dedicated, or to which it may hereafter, consistently herewith, be lawfully

The court therefore reviewed certain Diocesan canons governing church property, including canon 13.2, which provides as follow:

It is hereby declared that all real property which has heretofore been or shall hereafter be devised, conveyed to, or acquired by a Bishop, a Dean, or any official of the [Diocese], or any Rector therein, or any incorporated, or any unincorporated Parish or Mission in said Diocese, for use for religious worship, or for a Rectory, Parish House or School, *shall be taken and held by such devisee or grantee for the work of the [Diocese],* and no sale, conveyance or mortgage thereof ... shall be made by any Bishop, Dean or other Diocesan official, or by any Rector, or any incorporated Parish or Mission without the previous consent of The Ecclesiastical Authority, as defined in the Canon under that Title, and a majority of the members of the Standing Committee, or, if there be no Bishop, then by the consent of the Standing Committee only.

Exh. P–53 (emphasis added). The court found that the terms "such devisee or grantee" in the above canon referred to the Diocesan Bishop and therefore concluded that this canon "clearly place[d] the legal title to all Church property in the [Diocese] in the name of the [Bishop] to hold in trust for the benefit of the members of the Diocese." [19] *In re: St. James*

dedicated: And provided, All charters heretofore granted for any church, congregation, or religious society, without incorporating therein the requirement that the property, real and personal, of such corporation, shall be taken, held, and enure subject to the control and disposition as herein provided, but which are in other respects good and valid, and shall be in all respects as good and valid, for all purposes, as if the said requirement had been inserted therein when the said charters were originally granted....

10   P.S. § 81 (emphasis added).

19.   The trial court appears to have incorrectly interpreted canon 13.2 in finding that the terms "such devisee or grantee" in that canon refer to the Bishop. According to the plain language of the canon, those terms refer to the person or entity to whom or to which real property has been devised or conveyed, which may include the bishop, but also may include "a Dean, or any official of the [Diocese], or any Rector therein, or any incorporated, or any unincorporated Parish or Mission in said Diocese." Exh. P–53. Consequently, canon 13.2 does not place legal title to all property conveyed to a local church in the name of the

*the Less,* 2003 WL 22053337 at \*11. Accordingly, the court declared that the Bishop and Standing Committee were both the title holders and trustees of St. James' property on the basis of this canon.

On appeal, the Commonwealth Court, sitting *en banc,* affirmed the trial court's order outright. *See In re: Church of St. James the Less,* 833 A.2d 319 (Pa.Commw.2003). With respect to the trial court's conclusion that the Bishop and the Standing Committee were the title holders and trustees of St. James' property, the Commonwealth Court pointed out that the National Episcopal Church enacted a canon in 1979, which expressly states that the property of churches affiliated with the National Episcopal Church, such as St. James, is held in trust for the benefit of the National Episcopal Church and the Diocese. This canon, which is referred to as the "Dennis Canon," provides as follows:

> All real and personal property held by or for the benefit of any Parish, Mission or Congregation *is held in trust for this [National Episcopal Church] and the Diocese thereof in which such Parish, Mission or Congregation is located.* The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission, or Congregation otherwise existing over such property as long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its constitution and Canons.

Exh. P–60 (emphasis added). The court found that St. James was bound by the explicit trust language in the Dennis Canon as it had remained a member of the Diocese and the National Episcopal Church for twenty years following the adoption of the Dennis Canon and it had "failed to establish through its articles of incorporation or otherwise an intent to retain possession and control of church property." 833 A.2d at 326 n. 5. Although this canon solely required local churches to hold their property in trust for the Diocese and the National

Diocese. Rather, it indicates that such property shall remain local church property, but shall be held by the local church "for the work of the Diocese." *Id.*

Episcopal Church rather than deliver legal title to their property to the Diocese and the National Episcopal Church for them to hold as trustees, the Commonwealth Court affirmed the trial court's order declaring the Diocesan Bishop and Standing Committee the title holders and trustees of St. James' property on the basis of this canon.[20]

Appellants subsequently filed a petition for allowance of appeal with this Court and we granted allowance of appeal to consider whether the Commonwealth Court properly concluded that the Diocese has a trust interest in St. James' property and thereby affirmed the trial court's order declaring the Diocesan Bishop and Standing Committee the title holders and trustees of St. James' property.[21] While we agree with the Commonwealth Court that the Diocese has a trust interest in St. James' property, we nevertheless disagree with its

20. The Commonwealth Court also found that the trial court properly determined that the merger between St. James and the CSJL Foundation was invalid because St. James had not obtained the trial court's approval before diverting St. James' property to the CSJL Foundation, which had a different purpose than St. James. *See In re: St. James the Less*, 833 A.2d at 325–26. The Commonwealth Court additionally agreed with the trial court that St. James' vestry had acted with bad faith and breached their fiduciary duties by approving the merger plan. *See id.* at 327. However, the court found that damages could only be assessed against the vestry named as parties to the litigation. *See id.*

President Judge Colins dissented from the majority's decision, stating that he believed that the Diocese did not have any rights to St. James' property, in part because St. James never agreed to the Dennis Canon. *See id.* at 328–30 (Colins, J., dissenting). Judge Colins also disagreed with the majority's conclusion that the merger between St. James and the CSJL Foundation was invalid because, in his view, St. James did not have to obtain the trial court's approval for the merger as St. James' purpose did not change by virtue of the merger. *See id.* at 331–32. Lastly, Judge Colins disagreed with the majority that St. James' vestry breached their fiduciary duties because the evidence did not show that the vestry approved the merger "knowingly against the best interests of [St. James]." *Id.* at 332.

21. Appellants include St. James as well as former members of St. James' vestry who advocated the merger with the CSJL Foundation. Notably, in their petition for allowance of appeal, Appellants also asked this Court to consider whether the Commonwealth Court erroneously concluded that the merger was invalid and that the vestry breached their fiduciary duties. We did not grant allowance of appeal on these issues. Thus, the Commonwealth Court's decision on these issues is conclusive.

affirmance of the trial court's order declaring the Diocesan Bishop and Standing Committee the title holders and trustees of St. James' property.

State courts have a legitimate interest in resolving disputes concerning the ownership of church property. *See Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 445, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). In resolving such disputes, however, they are prohibited by the free exercise and establishment clauses of the First Amendment from inquiring into doctrinal issues or issues involving religious practices. *See Jones,* 443 U.S. at 602, 99 S.Ct. 3020; *Hull Memorial Presbyterian Church,* 393 U.S. at 449–51, 89 S.Ct. 601. While "a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters," the United States Supreme Court has specifically approved of two distinct approaches. *Jones,* 443 U.S. at 602, 99 S.Ct. 3020 (*quoting Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg,* 396 U.S. 367, 368, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (Brennan, J., concurring)); *see also Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 727, 20 L.Ed. 666 (1871); *Jones,* 443 U.S. at 602–05, 99 S.Ct. 3020.

The first is the "polity approach," which requires deference to the highest church tribunal that has ruled on an issue. The Supreme Court specifically declared its approval of this approach in *Watson v. Jones,* a case in which the Presbyterian Church of the United States (the "National Presbyterian Church") brought suit to gain possession of the property of a local church, which had withdrawn from the National Presbyterian Church. *See* 80 U.S. 679. The United States Supreme Court determined that in these circumstances, where the local church was "but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control," civil courts must defer to and enforce the decision of the highest

church tribunal that has ruled on the issue.[22]  *Id.* at 722–23, *see also id.* at 727–29 (noting that when local churches unite themselves to a general church organization, they implicitly consent to the government of the general church "and are bound to submit to it").  Applying this "polity approach" to the case before it, the United States Supreme Court upheld the National Presbyterian Church's determination that it retained the local church's property.  *See id.* at 733–34.

Almost a century later, the United States Supreme Court approved of a second approach to deciding church property disputes, which is termed the "neutral principles of law approach."  *See Jones v. Wolf,* 443 U.S. at 602–03, 99 S.Ct. 3020.  In *Jones,* the majority of the members of a local Presbyterian Church in Georgia voted to withdraw from the National Presbyterian Church and the dissenting members of the local church brought a lawsuit seeking to retain the local church's property for the benefit of the national church.  In deciding the case, the Georgia trial court looked to the applicable state statutes, the local church's charter, the property deed, and the National Presbyterian Church's constitution.  Finding that the property deed conveyed the property solely to the local church and that neither the statutes nor the other relevant documents indicated that the local church's property was to be placed in trust for the National Presbyterian Church, the trial court concluded that the majority of the members of the local church could retain the local church's property.  On appeal, the Supreme Court of Georgia affirmed, finding that the trial court properly applied "neutral principles of law" in deciding the parties' dispute.  *See Jones v. Wolf,* 241 Ga. 208, 243 S.E.2d 860 (1978).

Upon its review of the case, the United States Supreme Court concluded that a neutral principles of law approach was

**22.**  Alternatively, the Court concluded that where a local church has no relationship with a larger church organization and there is a schism that separates the members of the church, civil courts must determine "the rights of such bodies to the use of the property ... by the ordinary principles which govern voluntary associations." *Watson,* 80 U.S. at 724–25.

constitutionally acceptable.[23] *Jones*, 443 U.S. at 602, 99 S.Ct. 3020. The Court explained that this approach "relies exclusively on objective, well-established concepts of trust and property law" by requiring courts to resolve property disputes according to the terms of a governing statute, the property deed, and any other document that expresses the parties' intentions regarding the ownership of the property. *Id.* at 603, 99 S.Ct. 3020. According to the Court, this approach was based on "neutral" principles of law, which were unaffected by religious concepts, and thus, "it promise[d] to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice."[24] *Id.*

23. While the Supreme Court found that the neutral principles of law approach was constitutionally proper, it disagreed with the way in which the Georgia trial court applied that approach in the case before it. The Court pointed out that the case did not involve a dispute between a local church and a national church, but rather involved a dispute between a majority of the members of the local church and a minority of the members. While the Georgia trial court resolved the majority-minority dispute based on the wishes of the majority, the Supreme Court noted that neutral principles of law permit the "rule of majority representation [to be] overcome ... either by" state statutory provisions, or by charter or constitutional provisions that indicate how such a dispute is to be resolved. *Jones*, 443 U.S. at 607–08, 99 S.Ct. 3020. Thus, the Court remanded the case to the Georgia courts to specifically address whether the dispute should be resolved according to the presumptive majority rule or pursuant to some statutory, charter, or constitutional provision. *See id.* at 609–10, 99 S.Ct. 3020.

24. Although the Court found that the neutral principles of law approach was constitutionally acceptable, it recognized that civil courts could violate the constitution if they improperly applied the approach. Thus, the Court directed civil courts to scrutinize documents evincing the parties' intentions, such as a church charter or constitution, "in purely secular terms, and not rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Jones*, 443 U.S. at 604, 99 S.Ct. 3020. The Court then explained:

> [T]here may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the instruments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.

*Id.*

Following the Supreme Court's decision in *Jones*, numerous states, including this Commonwealth, adopted the neutral principles of law analysis for resolving church property disputes. *See Presbytery of Beaver-Butler v. Middlesex Presbyterian Church*, 507 Pa. 255, 489 A.2d 1317, 1321 (1985) (listing states that have adopted neutral principles of law analysis); *see also id.* at 1323 (adopting neutral principles of law analysis). In *Beaver-Butler*, a local Presbyterian church disaffiliated from the National Presbyterian Church and the National Presbyterian Church filed a lawsuit to obtain possession of the local church's property. The trial court granted summary judgment in favor of the local church after finding that there was no documentation showing that the parties intended to place the property in trust for the National Presbyterian Church. *See id.* at 1319; *see also Presbytery of Beaver-Butler v. Middlesex Presbyterian Church*, 80 Pa.Cmwlth. 211, 471 A.2d 1271, 1279 (1984). The Commonwealth Court reversed, explaining that the trial court should have applied the polity approach to the parties' dispute. *See Beaver-Butler*, 471 A.2d at 1276–77. Using that approach, the Commonwealth Court concluded that because the local church had been a subordinate member of the National Presbyterian Church, which was a hierarchically governed denomination, the local church was bound by the highest church tribunal's decision regarding the ownership of the property, which had been in favor of the national church. *See id.* at 1277.

The Commonwealth Court then went on to state that even if it were to apply a neutral principles of law approach to the case, it would hold that the National Presbyterian Church was entitled to the local church's property based on the Act of 1935 and the National Presbyterian Church's rules. *See id.* at 1279–80. The court explained that pursuant to the Act of 1935, the local church's property was subject to the National Presbyterian Church's rules and according to those rules, a local church could not alienate its property without the National Presbyterian Church's consent.[25] *See* 471 A.2d at 1279.

25. The court found that the local church needed the National Presbyterian Church's consent to alienate its property based on the national

Therefore, the court concluded that because the local church had never obtained the National Presbyterian Church's consent before disaffiliating from the national church with its property, the national church retained control over the local church's property under neutral principles of law. *See id.* at 1280.

On further appeal, this Court reversed the Commonwealth Court, stating that "the Commonwealth Court should not have applied the broad deference rule which it chose; and that in cases where the resolution of a property dispute involves no inquiry into ecclesiastical questions, courts of this Commonwealth are to apply the same principles of law as would be applied to non-religious associations." *Beaver–Butler,* 489 A.2d at 1323. We then explained that according to the well-established legal principles governing trusts, courts may only find that a trust exists where there is clear and unambiguous language or conduct indicating that the settlor intended to create a trust. *See id.* at 1324 (quoting *Bair v. Snyder County State Bank,* 314 Pa. 85, 171 A. 274, 275 (1934)).

Applying this "neutral" rule of law to the facts, we found that the settlor of the local church's property was the local church, rather than the national church, because the local church had been "created and incorporated on the local level by members of the parish" and had retained all of its property in its corporate name. *Id.* We then examined the National Presbyterian Church's Book of Order and found that it neither prohibited the local church from disaffiliating from the National Presbyterian Church nor contained any express trust language at the time that the local church was a member of the

church's Book of Order, which provided as follows: (1) when a local church formally dissolves, its property shall be "held, used and applied to such uses as the [National Presbyterian Church] should direct;" (2) a local church "may not sell, encumber, or lease real property without permission of the [National Presbyterian Church];" (3) the National Presbyterian Church may "take charge of" a local church if it determines that the local church is unable or unwilling to manage wisely its affairs; (4) the National Presbyterian Church has "exclusive authority over the uses to which the church buildings and property may be put;" and (5) the local church "shall deal with [its] property only as they may be authorized or directed by the [National Presbyterian Church]." *Beaver–Butler,* 471 A.2d at 1280.

national church. *See id.* 1324–25. Indeed, on that latter point, we emphasized that the National Presbyterian Church had recently added express trust language to the Book of Order, but that the local church had disaffiliated from the national church before the language was included. *See id.* at 1323–25. Thus, finding that there was no clear and unambiguous evidence showing that the local church "ever intended to convey [its] property interests to [the National Presbyterian Church]," we held that the Commonwealth Court erroneously concluded that the National Presbyterian Church had a trust interest in the local church's property.[26] *Id.* at 1325.

In the instant case, Appellants argue that the Commonwealth Court erred in finding that the Diocese has a trust interest in St. James' property because, as was the case in *Beaver–Butler,* there is no "clear and unambiguous" evidence that St. James intended to create a trust in favor of the Diocese. While Appellants acknowledge that National Episcopal Church placed express trust language in its canons when it amended the canons in 1979 to include the Dennis Canon, they contend that St. James cannot be bound by the Dennis Canon because it never expressly acceded to that canon. Moreover, they argue that the Dennis Canon cannot be applied to St. James simply by virtue of its membership in the National Episcopal Church because a member of a voluntary association cannot be bound by amendments to the association's rules that deprive the member of a vested property right. *See Marshall v. Pilots' Ass'n,* 206 Pa. 182, 183, 55 A. 916 (1903). Finally, Appellants claim that the Commonwealth Court's conclusion that the Diocese has a trust interest in St. James' property solely on the basis of the Dennis Canon violates the

26. We further noted that the Commonwealth Court's reliance on provisions from the Book of Order to support its finding that the National Presbyterian Church had a trust interest in the local church's property was misplaced as: (1) the overall intent of the book was to oversee the spiritual development of the member churches; and (2) the provisions mostly showed the national church's wishes and were "far from constituting the clear equivocal evidence necessary to support a conclusion that a trust existed." *Beaver–Butler,* 489 A.2d at 1325.

First Amendment as well as Article 1, Section 3 of the Pennsylvania Constitution.[27]

■ In the first instance, we note that a member of a voluntary association is bound by amendments to the association's rules so long as the amendments (1) are duly enacted; and (2) do not deprive the member of vested property rights without the member's explicit consent. *See Leatherman v. Wolf,* 240 Pa. 557, 564, 88 A. 17 (1913); *Marshall,* 206 Pa. at 183, 55 A. 916; *see also Calabrese v. Policemen's Benevolent Ass'n,* 157 N.J.Super. 139, 384 A.2d 579, 583 (1978). Accordingly, contrary to Appellants' contention, St. James is bound by the Dennis Canon even if it did not expressly accede to the canon as long as the above two requirements are satisfied.

■ With respect to the first requirement, Appellants argue that the Dennis Canon was improperly enacted because there is no evidence that (1) it was circulated to the local Episcopal churches before its adoption; or (2) members of St. James were present when it was adopted. The National Episcopal Church's canons, however, did not require that proposed amendments be circulated to local Episcopal churches or parish members to be present during the adoption of amendments. Rather, according to the National Episcopal Church's 1964 canons, to which St. James acceded when it amended its Charter in 1967, the National Episcopal Church could amend its canons based on "a concurrent resolution" by the two major branches of that church, the House of Bishops and the House of Deputies. *See* Exh. P–43 at canon 66, § 1. Moreover, according to the record evidence, it seems that just such a resolution was adopted with regard to the Dennis

27. Appellants also contend that the trial court improperly concluded that the Diocese has a trust interest in St. James' property on the basis of the Act of 1935. However, as explained above, the trial court did not find that the Act of 1935 expressly granted the Diocese a trust interest in St. James' property. Rather, the trial court merely explained that the Act of 1935 requires local churches to hold their property in accordance with the rules of the denomination with which they are associated and consequently, St. James' property was subject to the Diocesan canons governing local real property.

Canon during the September 1979 General Convention. *See* Exh. P–8.

Nevertheless, Appellants also assert that the Dennis Canon was not properly enacted because it was enacted immediately following its adoption, instead of the following January, which was the usual practice. However, this argument is also unavailing because even though the National Episcopal Church may have typically enacted canons in the January following their adoption, its canons did not require that it do so. *See* Exh. P–43 ("[A]ll amendments and repeals of Canons . . . *unless otherwise expressly ordered,* shall take effect on the first day of January following the adjournment of the General Convention at which they were enacted or made.") (emphasis added). Accordingly, as the National Episcopal Church was entitled under its canons to order the immediate enactment of a newly adopted canon and the evidence otherwise indicates that the National Episcopal Church adhered to its rules in enacting the Dennis Canon, we find no merit in St. James' arguments that the Dennis Canon was not properly enacted.

In addition to arguing that the Dennis Canon was not properly enacted, Appellants contend that St. James cannot be bound by the canon because it divests it of its property without its consent. However, we disagree with Appellants that St. James had a vested interest in its property prior to the enactment of the Dennis Canon because St. James' Charter makes clear that St. James had already agreed to hold its property in trust for the Diocese prior to the enactment of the Dennis Canon. In this regard, we initially note that St. James' Charter declares that St. James' purpose is to serve as a place to worship God *"according to the faith and discipline of the [National Episcopal Church]."* Exh. P–9 (emphasis added). More importantly, the Charter ensures that St. James will *always* be used for this purpose as it (1) states that any person who disclaims the authority of the National Episcopal Church or the Diocese can no longer be a member of St. James; and (2) requires St. James to obtain the Diocese's

consent for amendments to its Charter.[28]  *See id.*  Accordingly, St. James effectively agreed in these provisions to always accede to the authority of the National Episcopal Church and the Diocese and to forever serve as a place of worship for those who adhere to that same authority.  As such, it plainly held its property for the benefit of the National Episcopal Church and the Diocese, *i.e.*, in trust for those entities.  *See* Restatement (Second) of Trusts § 2 (defining trust as "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person"); Black's Law Dictionary (8th ed.2004) (defining trust as "[t]he right, enforceable solely in equity, to the beneficial enjoyment of property to which another person holds the legal title"); *see also In re: Evans' Estate*, 372 Pa. 284, 93 A.2d 683, 685 (1953) (no special form of terminology is necessary to create a trust, "nor is the absence of the word 'trust' controlling").

Other provisions specifically concerning St. James' property also compel the conclusion that St. James intended to, and did, hold its property in trust for the Diocese and the National Episcopal Church.  For example, when it acceded to the Diocesan canons in effect when it last amended its Charter, St. James specifically agreed to take and hold its property "for the work of the [Diocese]."  Exh. P–51 at canon XII, § II. Further, by acceding to the National Episcopal Church's canons, St. James agreed not to alienate or encumber its property without the Diocese's consent.  *See* Exh. P–43 at canons 6.3 ("No Vestry, Trustee, or other body, authorized ... to hold, manage, or administer [parish property] shall encumber or alienate the same or any part thereof without the written consent of the Bishop and Standing Committee of the Diocese...."), 25.2 ("It shall not be lawful for any Vestry, Trustees, or other body authorized by laws of any State or

---

**28.**  As St. James needed the Diocese's consent for amendments to its Charter, it would presumably also need the Diocese's consent for fundamental corporate changes, such as a merger, which would effectively amend its Charter.  *See, e.g.,* 15 Pa.C.S. § 1924 (requiring shareholder approval for merger if surviving corporation has different articles of incorporation than constituent corporation).

Territory to hold property for any [Parish] to encumber or alienate any consecrated Church or Chapel ... without the previous consent of the Bishop, acting with the advice and consent of the Standing Committee of the Diocese....."). Finally, St. James declared in its Charter that if it ever dissolves, its property will be placed in trust for the Diocese. *See* P–16. Through these provisions, St. James not only explicitly pledged that its property would always be used for Diocesan purposes, but by giving the Diocese the ultimate authority over decisions affecting its property, it acknowledged its obligation to the Diocese to always do so. Accordingly, these provisions, like the ones discussed earlier, are clear evidence that St. James intended to create a trust over its property in favor of the Diocese.[29] Furthermore, the evidence indicates that St. James' vestry were well aware that St. James had granted the Diocese such a trust interest because (1) the Bishop's attorney informed them in 1978 that the Diocese had a trust interest in St. James' property; and (2) they purposefully sought to merge into the CSJL Foundation to void the Diocese's trust interest in the property. *See* Exh. P–20.

On the basis of the above provisions, we find that St. James clearly intended to place its property in trust for the Diocese prior to the enactment of the Dennis Canon and consequently, the Dennis Canon does not deprive St. James of its vested property rights. Rather, the Dennis Canon "merely codified in explicit terms a trust relationship" that was implicit in St. James' Charter. *Rector, Wardens and Vestrymen of Trinity– St. Michael's Parish, Inc. v. Episcopal Church in the Diocese of Connecticut,* 224 Conn. 797, 620 A.2d 1280, 1292 (1993); *see*

---

**29.** While St. James argues that the above provisions do not place its property in trust for the Diocese because this Court found that similar provisions were insufficient to create a trust in *Beaver–Butler*, we find that the provisions in the instant case are distinguishable from those in *Beaver–Butler* primarily because they require St. James to *always* accede to the authority of the National Episcopal Church and the Diocese. *See Beaver–Butler,* 471 A.2d at 1280, *rev'd,* 489 A.2d at 1325 (noting that the National Presbyterian Church's Book of Order did not prohibit a local church from disaffiliating from the national church); *see also supra* Op. at pp. 445–46 n. 25, 888 A.2d at 806 n. 25, 447 n. 26, 888 A.2d at 807 n. 26.

*also Bishop and Diocese of Colorado v. Mote,* 716 P.2d 85, 105 n. 15 (Colo.1986); *Trustees of the Diocese of Albany v. Trinity Episcopal Church of Gloversville,* 250 A.D.2d 282, 684 N.Y.S.2d 76, 81 (1999). Given these circumstances, we hold that St. James is bound by the express trust language in the Dennis Canon and therefore, its vestry and members are required to use its property for the benefit of the Diocese.

In their final argument, Appellants contend that application of the Dennis Canon to them violates their constitutional rights because it "takes St. James' property on the basis of a religious canon alone." However, as explained above, we hold that St. James is bound by the Dennis Canon under neutral principles of law as well as the fact that St. James had already agreed to place its property in trust for the Diocese prior to the enactment of the Dennis Canon. Accordingly, contrary to St. James' contention, we are not simply deferring to a religious canon "to override the rights of parties under civil law." Appellants' Bf., at 49.

Thus, we agree with the Commonwealth Court decision insofar as it found that St. James' property was subject to a trust interest in favor of the Diocese. As explained above, however, the trial court's order, which the Commonwealth Court affirmed outright, declared the Diocesan Bishop and Standing Committee the legal title holders and trustees of St. James' property. This declaration is plain error because, as even Appellees acknowledge, St. James' property was deeded solely to St. James and St. James' retained ownership of its property. *See* Exhs. P–20, P–11—P–15. Accordingly, we reverse the Commonwealth Court's order to the extent that it affirmed the trial court's order declaring the Diocesan Bishop and Standing Committee the legal title holders and trustees of St. James' property and instead order that St. James retains legal title to its property and that St. James' members and vestry, rather than the Bishop, are required to act as the trustees of St. James' property and thereby, use the property for the benefit of the Diocese.[30]

**30.** Notably, the trial court ordered the Diocesan Bishop and Standing Committee to appoint a new vestry "to continue the daily managerial

Chief Justice CAPPY, and Justice CASTILLE, EAKIN and BAER join the opinion.

Justice SAYLOR did not participate in the consideration or decision of this case.

Justice NEWMAN files a concurring opinion.

Justice NEWMAN, concurring.

I agree with the decision of the Majority to reverse the Order of the trial court declaring the Bishop and Standing Committee the title holders of the property at issue in this case. Nevertheless, I reject the Majority's determination that that property is subject to a trust interest in favor of the Diocese because I do not believe that Appellees have produced clear and unambiguous evidence that St. James intended to create such a trust.

St. James was founded in 1846 by laypeople living in what is now the East Falls section of the City of Philadelphia. *In re Church of St. James the Less*, 833 A.2d 319, 327 (Pa.Cmwlth. 2003) (Colins, P.J., dissenting). The real property in dispute in the case *sub judice* consists of five parcels of land that St. James acquired on five different occasions over the course of eighty years. *In re Church of St. James the Less*, No. 953NP, 2003 WL 22053337, *1, *3 (Pa.Com.Pl. Mar. 10, 2003). Various improvements gradually were made to this land, including the erection of a church building, a burial ground, a rectory, a sexton's house, a parish house, a day school, and a memorial bell tower. *St. James*, 833 A.2d at 321. St. James acquired this real and personal property through donations made by its own parishioners as well as through purchases made with funds that those parishioners contributed. *Id.* at 327 (Colins, P.J., dissenting). The deed to each of the five parcels of land reflects that St. James is the fee simple owner of the property. *Id.* St. James remains today on the property where it was founded almost 160 years ago. *Id.*

duties of the parish." *In re: St. James the Less*, 2003 WL 22053337, at *21. Thus, this new vestry must act as the trustees of St. James' property.

Twenty years ago, in *Presbytery of Beaver–Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317, 1318 (1985), *cert. denied,* 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985), this Court addressed the very same issue we are asked to decide in the instant case, namely, "whether the members of a local church which has been affiliated with a national denomination can retain ownership of the assets and property of that local church after having terminated their membership in that denomination." After a careful examination of the relevant documents in that case, including the deeds to the property, the charter of the local church, and the denominational constitution, we found no support for the determination of the Commonwealth Court that the record revealed an intent on the part of Middlesex Church to create a trust for the benefit of the national denomination. Although the facts of *Beaver–Butler* are not identical to those *sub judice*,[1] I believe that a comparison of the two cases undermines, rather than supports, the holding of the Majority that St. James intended to create a trust with respect to its property for the benefit of the Diocese.

As the Majority notes, in *Beaver–Butler,* we explicitly adopted the "neutral principles of law" approach to resolving church property disputes that the United States Supreme Court endorsed in *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). Consequently, we must decide the instant dispute solely based on "objective, well-established concepts of trust and property law familiar to lawyers and judges." *Id.* at 603, 99 S.Ct. 3020. Few, if any, principles of the law of trusts are further from doubt than the requirement of "clear and unambiguous language or conduct evidencing the intent to create [a] trust" before a court may find that a trust has been created. *Beaver–Butler,* 489 A.2d at 1324. Indeed, as we emphasized in *Beaver–Butler,* it is beyond dispute that a

---

1. Initially, I note the similarly grassroots origins of Middlesex Church, which, as we mentioned in *Beaver–Butler,* "was not a creation or offshoot of the central denomination. Rather, the record establishe[d] that the Middlesex [C]hurch was created and incorporated on the local level by members of the parish; and that all property was retained in the corporate name of the local church." *Beaver–Butler,* 489 A.2d at 1324.

trust "cannot arise from loose statements admitting possible inferences consistent with other relationships." *Id.* (quoting *Bair v. Snyder County State Bank,* 314 Pa. 85, 171 A. 274, 275 (1934)). To create an enforceable trust with respect to the real property at issue in this case, St. James would have had to declare in writing that it would hold its property for the benefit of the Diocese. *See* 33 P.S. § 2.

The Majority cites five principles codified in ecclesiastical documents that it perceives as "compel[ling] the conclusion that St. James intended to, and did, hold its property in trust for the Diocese and the National Episcopal Church." (Majority Op. at 450–51, 888 A.2d at 809). These principles include three that are codified in the charter of St. James ("Local Charter" or "Charter") and two that derive from canons of the National Church (National Canons). The language upon which the Majority relies that is contained in these documents falls far short of the "clear and unambiguous" standard that we have always employed to determine whether a trust has been created.

The Majority initially makes reference to various provisions dispersed throughout the Local Charter in support of its contention that St. James intended to create a trust with respect to its property for the benefit of the Diocese. First, according to the Majority, St. James "agreed to hold its property in trust for the Diocese" when it declared in its Charter that its purpose was "to serve as a place to worship God 'according to the faith and discipline of the [National Episcopal Church].'" (Majority Op. at 448–50, 888 A.2d at 808 (quoting Charter)). In *Beaver–Butler,* however, we found unpersuasive the reliance of the Commonwealth Court on the presence of remarkably similar language in the charter of Middlesex Church. *See Presbytery of Beaver–Butler v. Middlesex Presbyterian Church,* 80 Pa.Cmwlth. 211, 471 A.2d 1271, 1280 (1984), *rev'd,* 507 Pa. 255, 489 A.2d 1317 (1985) (quoting the charter as declaring that the purpose of Middlesex Church was to "worship Almighty God according to the faith, doctrine, creed, discipline and usages of the Presbyterian Church of the U.S.A.").

Nevertheless, the Majority emphasizes the permanent nature of these purposes, as reflected in a pair of provisions of the Local Charter, namely, those that: (1) excluded from membership "any person who disclaims the authority of the National Episcopal Church or the Diocese;" and (2) required that "[St. James] obtain the Diocese's consent for amendments to its charter." (Majority Op. at 448–51, 888 A.2d at 808–09). The Majority distinguishes the instant case from *Beaver–Butler* on the basis of the absence of similar provisions in the charter of Middlesex Church. (*Id.* at 451 n. 29, 888 A.2d at 809 n. 29). Nevertheless, the fact that these provisions fail even to mention the *res* of the supposed trust precludes the possibility that St. James intended by including this language in its Charter to create a trust with respect to its property for the benefit of the Diocese. *See Bair,* 171 A. at 275–76.

In addition, the Majority cites the declaration of St. James in its Charter "that if it ever dissolves, its property will be placed in trust for the Diocese." (Majority Op. at 450–51, 888 A.2d at 809). I fail to understand the relevance of this provision, for the trial court specifically found that "there was no corporate dissolution of [St. James], and therefore no devolvement of its property to the Diocese." *St. James,* 2003 WL 22053337, at *12. Moreover, in *Beaver–Butler,* we found similar language in the denominational constitution to fall far short of the "clear and unambiguous" evidence required to show an intent to create a trust. *See Beaver–Butler,* 489 A.2d at 1325; *Beaver–Butler,* 471 A.2d at 1280 (quoting the provision as providing that, "[i]n the case of a formal dissolution or extinction of a particular church, its properties shall be held, used and applied to such uses as the presbytery should direct or sold by the presbytery"); *see also id.* at 1273 (defining "presbytery" as a body of ministers and elders representing the particular churches within a geographical district who are charged with ensuring that the churches within that district abide by the denominational constitution).

In addition to the above-quoted passages from the Local Charter, the Majority relies upon two principles derived from the National Canons as clear and unambiguous evidence of an

intent on the part of St. James to create a trust whereby it would hold its property for the benefit of the Diocese. Taking the less persuasive argument first, the Majority cites excerpts from a pair of Canons prohibiting the encumbrance or alienation of parish property without the prior consent of the Bishop and Standing Committee of the Diocese. (Majority Op. at 450–51, 888 A.2d at 809 (quoting Canons 6.3 and 25.2)). Again, the Majority fails to mention the fact that, in *Beaver–Butler*, a materially identical provision was codified in the denominational constitution. *See Beaver–Butler*, 471 A.2d at 1280 (citing the Presbyterian Book of Order for the provision that "[t]he particular church may not sell, mortgage, encumber, or lease real property without permission of the presbytery"). It was the presence of this very provision, together with the declaration of purpose of Middlesex Church and the constitutional provision regarding the contingency of dissolution, that this Court in *Beaver–Butler* considered "far from constituting the clear unequivocal evidence necessary to support a conclusion that a trust existed." *Beaver–Butler*, 489 A.2d at 1325. In the instant case as well as in that one, such language at most serves as evidence of the desired interpretation of the putative trustee, namely, the national denomination. *Id.*

The last remaining documentary evidence that the Majority cites as clearly and unambiguously showing an intent on the part of St. James to create a trust is that in which "St. James specifically agreed to take and hold its property 'for the work of the [Diocese].'" (Majority Op. at 450–51, 888 A.2d at 809) (quoting Canon XII, § II (alteration in original)). The quotation, in its full context, reads as follows:

It is hereby declared that all real property which has heretofore been or shall hereafter be devised, conveyed to, or acquired by ... any incorporated, or unincorporated Parish or Mission in said Diocese, for use for religious worship, or for a Rectory, Parish House or School, shall be taken and held by such devisee or grantee for the work of the Protestant Episcopal Church in the Diocese of Pennsylvania....

*St. James*, 2003 WL 22053337, at \*4 (quoting Canon XII, § II) (first omission in original). Although this language comes closer than the other provisions upon which the Majority relies to suggesting the creation of a trust, well-established concepts of Pennsylvania trust law compel the conclusion that this provision, too, failed to create a trust for the benefit of the Diocese.

Notably, the language just quoted is not a discrete declaration issued and signed by representatives of St. James. Rather, it is merely the first clause of a provision that, in 1941, the Diocese adopted as an amendment (1941 Amendment) to its own Canons (Diocesan Canons). A beneficiary, however, cannot unilaterally declare a trust. In the language of President Judge Colins, who dissented from the Opinion of the Majority of the Commonwealth Court:

> There is simply no mechanism by which a beneficiary can create a trust in Pennsylvania without the explicit consent and cooperation of the settlor. A trust may be created on the part of the **settlor** (St. James) and not on the part of the **beneficiary** (the Diocese).

*In re Church of St. James the Less*, 833 A.2d 319, 329 (Pa.Cmwlth.2003) (Colins, P.J., dissenting). Moreover, not only must the settlor clearly intend to create a trust; the statute of frauds requires that he must also affix his signature to the trust instrument to memorialize that intent. 33 P.S. § 2 ("All declarations or creations of trusts or confidences of any lands, tenements or hereditaments, and all grants and assignments thereof, shall be manifested by writing, signed by the party holding the title thereof. . . ."). As we ourselves confirmed in *Beaver–Butler*, "the primary focus must be on the intent of the settlor **at the time of the creation of the alleged trust.**" *Beaver–Butler*, 489 A.2d at 1324 (emphasis added).

As the Majority states, when, in 1967, St. James last amended its own Charter, it thereby formally acceded to the Diocesan Canons as they existed at that time. The Majority, however, fails to cite any evidence from the record to support its contention that St. James thereby specifically agreed to

hold its property for the sole benefit of the Diocese. Rather, by the 1967 "accession" of St. James to the Diocesan Canons, nothing more is meant than the republication of the Charter subsequent in time—twenty-six years to be precise—to the amendments that the Diocese, in 1941, made to its Canons.[2]

As the trial court noted, the 1967 Charter amendments left intact the following provision from the Local Charter: "[St. James] adopts the constitution, canons, doctrine and worship of the Episcopal Church and the Diocese." *St. James*, 2003 WL 22053337, at *2 (quoting "intrinsic provisions" of the Charter). I can understand how one could make the inference that, by declining in 1967 to repeal this provision from its Charter, St. James intended to recognize the 1941 Amendment as having created a trust with respect to its property for the benefit of the Diocese. Nevertheless, "[t]he intention to create a trust must be definite and particular." *In re Evans' Estate*, 372 Pa. 284, 93 A.2d 683, 685 (1953). The act of St. James in amending its Charter in 1967 falls far short of constituting the clear and unequivocal evidence that we require to find that a trust has been created. In any event, in finding that a trust was thereby created, the Majority relies not upon any words of the 1967 amendments but, rather, upon the **act** of amending. Therefore, because only a **writing** can create trusts as to land, 33 P.S. § 2, the 1967 amendments could, at most, affect interests in the personal property of St. James.

In conclusion, although I agree with my colleagues that title to the property remains in the name of St. James, I am unable to accept their determination that that property is subject to a trust interest in favor of the Diocese. When viewed in the light of objective, well-established concepts of the law of trusts in Pennsylvania, neither the Local Charter, nor the National Canons, nor, least of all, the deeds to the property in dispute in this case provide any clear and unambiguous evidence of an

2. It is worth noting that, in making the 1967 amendments, St. James chose not to insert the language of the 1941 Amendment into its own Charter.

intent on the part of St. James to create a trust for the benefit of the Diocese.